Jose **MONTEMAYOR**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 50732.

Court of Criminal Appeals of Texas.

March 10, 1976.

On Rehearing Oct. 27, 1976.

W. J. Sames, Eagle Pass, for appellant.

John F. Pettit, Dist. Atty. and Benjamin A. Martinez, Asst. Dist. Atty., Del Rio, Jim D. Vollers, State's Atty. and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

ODOM, Judge.

This appeal is from a conviction for aggravated assault upon a peace officer, V.T.C.A. Penal Code Sec. 22.02(a)(2). Punishment was assessed by the court at confinement for two years and a fine of one thousand dollars.

■ The judgment must be reversed because the trial court erroneously excluded rebuttal evidence offered by the appellant.

A lengthy recitation of the facts is not necessary. This prosecution arose out of two fights between appellant and the complaining witness, Deputy Sheriff Alfredo Menchaca. Both occurred during booking procedures at the Maverick County jail.

There were four witnesses to the outbreak of hostilities. Menchaca and another deputy sheriff testified that appellant without provocation attacked Menchaca. Appellant and his mother testified that Menchaca without provocation or warning suddenly charged appellant in an attacking manner, and that appellant swung at the officer in self-defense. The record is in similar dispute as to the identity of the aggressor in a second fight occurring a few minutes later.

■ Appellant's defense was predicated upon a theory of self-defense codified in the new Penal Code. V.T.C.A. Penal Code Sec. 9.31(a).[1]

Appellant testified that he had known Menchaca for about four years and that there was ill will between the two. He said he feared Menchaca, and that he was afraid Menchaca would beat him. His fears were justified, he said, when Menchaca twice assaulted him on the day of the alleged offense.

Appellant's attorney tried to elicit evidence supportive of his theory of the case while cross-examining Menchaca. In the course of this cross-examination Menchaca admitted that he knew one Oscar Antu, but categorically denied that he had ever been involved in any fight with Antu.

Later, appellant's attorney called Antu to testify. The record reflects by examination of the witness outside the presence of the jury that Antu would have testified that deputy Menchaca without provocation had beaten him in the Maverick County jail.

■ The trial court erred in excluding this testimony. It is fundamental that when a witness in a criminal case testifies about a specific fact or event, and that fact or event is more than a very minor detail of his testimony, then the opposing side may present evidence to rebut the testimony. Such impeachment goes directly to the credibility of the witness, a factor that in many cases may critically affect the outcome of the prosecution. E. g., *Daley v. State,* Tex.Cr.App., 491 S.W.2d 932; *Simons v. State,* 167 Tex.Cr.R. 15, 317 S.W.2d 740; *Freeman v. State,* 166 Tex.Cr.R. 626, 317 S.W.2d 726; *Redding v. State,* 161 Tex. Cr.R. 53, 274 S.W.2d 712 (on motion for rehearing). The right to impeach the prosecution's witnesses is also one aspect of the Sixth Amendment right of confrontation. See, e. g., *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Napue v.*

1. "(a) . . . a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force."

We note that appellant several times tried to testify as to all the circumstances contributing to his alleged reasonable belief that force was immediately necessary to protect himself against Menchaca's use or attempted use of unlawful force. Without reaching the merits of a ground of error predicated upon the exclusion of such testimony by the trial court, we feel constrained to state our opinion that under the above quoted statute a defendant is entitled to present evidence relevant to such belief.

*Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

Nor can we conclude that the error was harmless. The question of guilt was fiercely contested and hinged primarily upon the relative credibility of the witnesses. Moreover, the point upon which appellant sought to impeach the complaining witness was critical to his entire defense.

For failure of the trial court to allow appellant to impeach the testimony of the complaining witness, the judgment is reversed and the cause is remanded.

DOUGLAS, Judge (dissenting).

The majority reverses this conviction because the trial court excluded the testimony by defense witness Oscar Antu on the ground ". . . that when a witness in a criminal case testifies about a specific fact or event, and that fact or event is more than a very minor detail of his testimony, then the opposing side may present evidence to rebut the testimony. Such impeachment goes directly to the credibility of the witness, a factor that in many cases may critically affect the outcome of the prosecution."

Appellant was taken to jail because a federal warrant had been issued for his arrest. He was at the jail when he hit the officer. On *cross-examination* defense counsel asked Deputy Menchaca if he had beaten Antu. The court excluded Antu's testimony on the basis that it was not relevant nor did it have any connection with the case at bar. Appellant, outside the presence of the jury, then developed the following bill of exception:

"Q. (Mr. Sames, Defense Counsel): I'll start from the beginning. State your name.

"A. Oscar Antu.

"Q. Mr. Antu, have you ever been beaten in the Maverick County Jail?

"A. Yes, sir.

"Q. Have you ever been beaten by Deputy Sheriff Santoya in the Maverick County Jail?

"A. No, sir.

"Q. Was Deputy Santoya present when you were beaten by Deputy Sheriff Menchaca in the Maverick County Jail?

"A. Yes, sir.

"Q. Did you do anything to provoke this beating, that you know of?

"A. No, sir.

"MR. SAMES: No further questions.

"THE COURT: All right. The Court's ruling will stand; this testimony will be excluded. You have your Bill. This is all you have from this witness?

"MR. SAMES: Yes."

As pointed out in the majority's opinion, appellant's defense was predicated upon a theory of self-defense. The only evidence in this record to support this theory is the testimony of the appellant and his mother, Blanco Montemayor, and that of the mother is less than supportive of appellant's theory. In fact, appellant's own testimony disproves his own theory of self-defense as he admits that he struck Deputy Menchaca first and, from the evidence, without provocation. Deputy Menchaca did not threaten to hit nor hit the appellant. Appellant testified on direct examination:

"Q. All right. What was the nature of the conversation you had immediately after all of you got inside the jail?

"A. They said they had an order for arrest for me, and they were looking all in the drawers for it, I guess. I don't know what they were looking for. Then they told me they didn't have that order for arrest, and they had to call San Antonio. And at that time, that's when Deputy Menchaca started yelling at me.

"Q. What was he yelling at you, Joe?

"A. I can't remember. I heard him yelling at me, you know.

"Q. Did you say anything back to him, Joe?

"A. All I said was, you know I talked, but I didn't finish saying anything when he came right at me. *I don't*

*know if he was going to hit me, but he was charging me, and that's when I hit him.* (Emphasis supplied)

"Q. You hit him?

"A. Once.

"Q. Did you feel he was going to attack you at that time?

"A. Yes, sir. He did attack me. He was coming at me, and I don't know for what other reason he was. He was not walking, he was charging at me.

"Q. Did your mother do anything about this?

"A. I don't think she had time to react or anything.

"Q. Was Mr. Menchaca on the other side of your mother from you?

"A. Yes, sir.

"Q. In other words this is where you were; this is where your mother was, and this is where Mr. Menchaca was? (Indicating)

"A. Yes, sir.

"Q. And when you were in those positions there, would you describe again what happened?

"A. That's when Menchaca came at me. I saw him coming and that's when I hit him, because I thought he was going to hit me. After that, Cortez grabbed me and Menchaca was going for the hair, and my mother was trying to get Menchaca off me. Then they put me in the cell, and after that they told my mother she had to leave."

He further testified that he was not injured during the first fracas that occurred:

"Q. Were you injured in that fracas, or that fight?

"A. No, sir.

"Q. You were not injured?

"A. No."

With regard to the second fight, it is evident again that the appellant struck the first blow. As the appellant continued on direct as follows:

"Q. How long did you stay in that cell, Joe?

"A. For about 20 minutes.

"Q. Then what happened after this 20 minutes?

"A. Then they called me out and gave me the order of arrest, the number for the order of arrest, and told me what the bond was. This was Cortez. Cortez was telling me this; telling me to take everything out of my pockets. I took everything out of my pockets and put it on the table, the desk, and then Menchaca —well, after this I asked 'What are the charges?', and at the same time Menchaca asked me to take off my belt. I said 'First, let Cortez tell me the charges'. That's when he came at me and *I hit him. I was going to hit him again,* but Cortez grabbed me. He was hitting me there and —" (Emphasis supplied)

Nowhere does the appellant use the words "attacking manner"; he simply states that Menchaca was "charging" at him without clarification. When his attorney questioned him as to his reason for believing he might be attacked, the following transpired:

"Q. Joe, you mentioned you were trying to defend yourself. Did you have any reason to believe that Mr. Menchaca might try to attack you while you were there?

"A. Yes, sir.

"Q. Could you tell me what that reason is?

"A. Because I had heard how he—

"THE COURT: No, now let's not get into that—

"BY MR. SAMES:

"Q. *Joe, were you afraid of Mr. Menchaca at that time?*

"A. *No, sir.* (Emphasis Supplied)

"Q. Was there anything about the way he came after you that gave you reason to believe he might hurt you?

"A. Yes, sir. The first time he attacked me, so I thought he would do the same thing.

"Q. So then they let you sit down. Did you sit down in a chair there?

"A. Yes, sir.

"Q. Was there any more fighting after that?

"A. No, sir."

From an analysis of the foregoing portions of the appellant's testimony, it is apparent that appellant hit Deputy Menchaca without provocation during the first fight and then attempts to justify his hitting of the deputy during the second fight by stating that Deputy Menchaca had attacked him the first time and he expected the same the second time the deputy came toward him. A direct contradiction to his testimony concerning the first fight wherein he stated he was not afraid of Deputy Menchaca at that time, but afraid only the second time.

Mrs. Montemayor, the appellant's mother, was even less precise in her testimony. After drawing a diagram on the blackboard showing the location of Deputy Menchaca and Cortez and the appellant when she arrived at the jail, she testified:

"Q. (By Mr. Sames): Were the three people talking when you came into the office there?

"A. My son was asking questions.

"Q. What was he asking about?

"A. Why he was being placed under arrest.

"Q. Did anyone else say anything about that time?

"A. Not at that time. Mr. Cortez only opened a drawer.

"Q. What was Mr. Menchaca doing then?

"A. He was standing on one side.

"Q. What happened immediately after that time?

"A. Mr. Menchaca told my son that there was nothing he should be asking about.

"Q. What did you (sic) son say?

"A. Well, at the moment when Mr. Menchaca said that, then he advanced toward my son.

"Q. Was your son talking at that time?

"A. No.

"Q. I want to know what happened before Mr. Menchaca charged at him, if he charged at him?

"A. Only why was he being held; why was he being placed under arrest.

"Q. Was anyone talking in a loud voice?

"A. No.

"Q. What did Mr. Menchaca do then?

"A. He went behind me, and over to my son.

"Q. Would you describe exactly what Mr. Menchaca did?

"A. Well, certain parts, because I got very nervous. When he said some bad words to my son that he didn't have to say, and when he charged toward my son, then I got very nervous. Because he had made an attempt to reach for his gun too.

"Q. Did he draw his gun?

"A. No.

"Q. Did Joe hit Mr. Menchaca?

"A. I didn't see that.

"Q. Were you facing in such a position that it is possible that Joe may have hit Mr. Menchaca without your seeing it?

"A. Yes, without seeing him.

"Q. Did Mr. Menchaca and Joe get into a fight?

"A. Yes, well, when he defended himself.

"Q. What did Mr. Menchaca do?

"A. By the time I realized it they were already, and then Mr. Cortez got up.

"Q. What did Mr. Cortez do?

"A. He grabbed him from right here with the arm.

"Q. Was anyone else in the room at this time?

"A. At that time, no."

Then, on cross-examination, she stated that she watched Deputy Menchaca charge her son, did not see what happened when he reached her son, and then saw her son defend himself.

The record in this cause is lengthy; there is a lot of testimony, much of which is

conflicting. Yet, there remains no justification for allowing the appellant to attempt to impeach Deputy Menchaca for prior acts of misconduct in the case at bar. It is well established that evidence of specific acts of misconduct against an accused or a witness is not admissible for impeachment purposes. 1 Branch's Ann.P.C.2d, Section 190, page 209; *Garcia v. State,* 454 S.W.2d 400 (Tex. Cr.App.1970); *Tomlinson v. State,* 163 Tex. Cr.R. 44, 289 S.W.2d 267 (1956); *Hunter v. State,* 168 Tex.Cr.R. 160, 324 S.W.2d 17 (1959).

The Uniform Rules of Evidence, Rule 22(d), prohibit use of particular acts of misconduct for the purpose of impeachment as stated in Texas Practice, Evidence, McCormick & Ray, Section 656, page 497:

> "The rule has long been established and is now universally recognized that such specific acts may not be proved by the testimony of other witnesses. This rule rests upon two reasons of policy: (1) The admission of such evidence would tend to confuse the issues; (2) It would unfairly surprise the witness. He cannot be expected to come prepared to disprove every act of his life which may be alleged by the opposing party."

It should also be noted that appellant did not show by his Bill of Exception whether or not the alleged beatings of Antu occurred years before or sometime after the incident in question.

This was a collateral matter not in issue in the case. Does the majority intend to hold that this is a good rule of evidence for defense witnesses including the accused? A good rule of evidence applies to any witness. Under this rule a prosecutor on cross-examination may ask the accused in an assault case if he has beaten up another person without mentioning the time in an unrelated matter. If he answers that he has not, the State then can bring in the person asked about and offer testimony that he was beaten up by the defendant. This would apply to any witness either for the prosecution or the defense to show credibility.

*No error is shown. The judgment should be affirmed.*

### ON STATE'S MOTION FOR REHEARING

ROBERTS, Judge.

The State contends that our holding is in conflict with our recent decision in *Hatley v. State,* 533 S.W.2d 27 (Tex.Cr.App.1976). We disagree.

In *Hatley,* we rejected the State's contention that its cross-examination of a defense witness opened the door to proof of the good reputation of the deceased because the State could not rely on its own questioning as an invitation to rebuttal. Furthermore, we held in that case that the defendant's testimony did not constitute proof of the deceased's reputation. Therefore, the only basis for rebuttal was the State's cross-examination.

In the case at bar, appellant's defense of self-defense was not fully developed because the trial court did not allow the appellant to testify about his knowledge of the fight between Deputy Menchaca and the witness Antu. As stated in the majority opinion on original submission, the appellant should have been allowed to testify as to this knowledge in order to show that he reasonably believed that force was immediately necessary to protect himself from Deputy Menchaca. If this had been permitted, the issue of Menchaca's fight with Antu would not have been injected solely by the appellant's cross-examination of Menchaca. Consequently, *Hatley* is not applicable.

Furthermore, the State's contention that the impeachment was on a collateral matter is based on the fact that there was no proof offered that the appellant knew of Menchaca's assault upon Antu. If the appellant had been permitted to testify as to his knowledge of such assault, then it would have been put in issue by his testimony that it was a part of the basis for his belief that force was immediately necessary. Consequently, it would not have been a collateral matter.

For the reasons stated, the State's contentions on rehearing are overruled.

DOUGLAS, Judge (dissenting).

On original submission, the majority held that proffered testimony of an alleged isolated attack by Officer Menchaca upon Oscar Antu at some undesignated time which had no connection with the present case was admissible to effect the credibility of the officer. The majority now, on motion for rehearing, in an attempt to justify that erroneous holding, relies heavily upon self-defense.

There was no self-defense in the case. There was no testimony that Officer Menchaca was striking at or attacking appellant. Appellant testified that he was not afraid of Menchaca.

In *McFarlane v. State*, 159 Tex.Cr.R. 658, 266 S.W.2d 133 (1954), the conviction was for aggravated assault and this Court held that there is no right of self-defense against a mere appearance of a lesser attack but only against an actual attack. There is no testimony by any witness that Menchaca used or attempted to use unlawful force.

A good rule of evidence works both ways. If the majority follows its holding in future assault cases, the prosecution will be allowed to introduce evidence that a testifying defendant assaulted another at some unknown time even if such an assault would be collateral and have nothing in connection with the case on trial. This has not been the rule until today. There is no proffered testimony that this alleged attack was unprovoked and not in self-defense or as some of the majority sometimes write, there is no showing how the attacks were similar in nature. There is no showing how remote the alleged attack was. It appears that the majority is allowing the defense to try Officer Menchaca as a criminal generally.

No error has been shown. The State's motion for rehearing should be granted and the judgment should be affirmed.