Clifford Lincoln McILVEEN, Appellant,

v.

The STATE of Texas, Appellee.

No. 53764.

Court of Criminal Appeals of Texas.

Dec. 14, 1977.

Appellant's Motion for Rehearing Denied Jan. 18, 1978.

Mac L. Bennett, Jr., Normangee, Jack B. Ellison, Buffalo, for appellant.

Robert W. Gage, County Atty., Teague, Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

DAVIS, Commissioner.

Appeal is taken from a conviction for voluntary manslaughter. Punishment was assessed by the jury at 15 years.

The sufficiency of the evidence is not challenged, therefore a brief statement of the facts will suffice. Ted Spurgeon, Deputy Sheriff of Freestone County, testified that on September 27, 1974, the appellant walked into the sheriff's office with a bloody and broken .22 rifle in his hands and stated: "I need some help. I think I killed a man." Appellant then took Spurgeon and others to a dirt road where the body of Cicero Watts was found lying next to his pickup truck with his head "smashed in." The appellant testified that the deceased and appellant's wife had been "messing around." Appellant testified that on three separate occasions over the years he had told the deceased to leave his wife alone. Appellant testified that on September 27, 1974, he had followed the tracks of his wife's car onto the secluded road where the killing occurred. Upon arrival, he found the deceased and his wife together in the deceased's truck. Appellant took his rifle from the car and walked toward the truck and yelled: Hold it. Nobody run." Appellant then fired the rifle two or three times in the air. Mrs. McIlveen jumped from the truck and ran across a field. Appellant testified the deceased jumped from the truck and was reaching in for his shotgun. Appellant then opened fire, after which he "rushed in" and beat the deceased with the butt of his rifle.

The appellant first complains that the jury was allowed to separate on three occasions during its deliberations without the personal consent of the appellant.

The record reflects that on July 23, 1975, the jury began its deliberation on guilt or innocence at 4:45 p. m. At 7:30 p. m., the jury sent out a note asking if they could go to eat. The jury was brought into open court and the following took place:

"THE COURT: Ladies and gentlemen. As I recall the last note indicated you wished to recess now for some food and then you would return and work. I have brought you back into the courtroom for the reason I need at this point to again admonish you that during your absence you are not to discuss this case among yourselves nor with others nor permit anyone to discuss it with you. . . . Don't discuss the case at all until all twelve are back in the jury room. I will

see you back here at whatever time you all wish to finish up.

"MR. GAGE [County Attorney]: Do they all go together?

"THE COURT: Any objection to their separating, gentlemen?

"MR. BENNETT [Defense counsel]: No objection on the part of Mr. McIlveen.

"THE COURT: They are not required to and the lawyers have indicated they have no objection."

The appellant was never asked for and never gave his personal permission for the separation.

The jury resumed its deliberations at 8:15 p. m. and worked until 9:35 p. m., when they were recessed and allowed to separate for the night. Once again appellant's attorney gave his consent, but the appellant said nothing.

The jury started deliberating at 9:00 a. m. the next morning, July 24, 1975. At 9:45 they returned a verdict finding the appellant guilty of voluntary manslaughter.

The court finished reading the charge on punishment to the jury at 11:45 a. m., and the jury indicated they would like to eat before they started their deliberations. The court, without seeking the consent of the appellant or his attorney, permitted the jury to separate for lunch. The jury returned at 1:15 p. m. and began their deliberations on punishment.

Article 35.23, V.A.C.C.P., provides, in pertinent part:

"When jurors have been sworn in a felony case, the court may, at its discretion, permit the jurors to separate until the court has given its charge to the jury, after which the jury shall be kept together, and not permitted to separate . . . until a verdict has been rendered or the jury finally discharged, unless by permission of the court with the consent of each party."

1. It is not entirely clear from his brief whether or not the appellant seeks to complain of the overnight separation of the jury in this appeal. The record reflects specifically that he did not make such separation a part of his motion for a new trial. To be a valid ground of error in this Court, the separation needs to be alleged in the

In *Rhynes v. State*, 479 S.W.2d 70, Tex. Cr.App., this Court said: "the record should show that appellant personally consented to the jury separation" after the charge of the court had been read and argument concluded at the guilt stage of the trial.

In *Goodall v. State*, 501 S.W.2d 342, 343, Tex.Cr.App., this Court said:

"We affirm the language of *Rhynes, supra,* and hold that when the jury is allowed to separate after the charge has been read by the court, and before it returns a verdict, the record must show the personal consent of appellant. Absent such a showing, the burden is on the State to rebut the presumption of harm."

 Appellant is complaining about the separations for dinner on the 23rd and for lunch on the 24th.[1] On both of these occasions, the record clearly reflects that the appellant did not give his personal consent for the separation. The burden is thus shifted to the State to "rebut the presumption of harm."

In an effort to rebut the presumption, the State elicited testimony from 11 of the 12 jurors that they had in no way violated the court's instructions regarding not discussing the case during the two separations in question. The appellant stipulated that if the twelfth juror were called, she would have testified that she too followed all of the court's instructions regarding separation.

The appellant argues that this is not sufficient to rebut the presumption. He urges that it is an "absurdity" to "assume that a juror would admit before the Trial Court that he had" violated the court's instructions.

 It is well established that issues of fact as to jury misconduct raised at a hearing on motion for new trial are for the determination of the trial judge. See

motion for new trial so the State may have the opportunity to rebut the presumption of harm. *Green v. State*, 510 S.W.2d 919, Tex.Cr.App. If appellant does seek to present such error here for the first time, it has not been properly preserved and will not be considered.

*McCartney v. State,* 542 S.W.2d 156, Tex.Cr. App., and cases there cited. The court's decision will not be reversed unless an abuse of discretion is shown. *Appleman v. State,* 531 S.W.2d 806, Tex.Cr.App. (opinion on motion for rehearing); *Powell v. State,* 502 S.W.2d 705, Tex.Cr.App.

█ The trial judge heard all of the witnesses and was free to believe or disbelieve any or all of them. No abuse of discretion is shown in the instant case where the court's finding is based on the unrefuted testimony of all of the jurors that they had not violated the instructions.

The appellant next contends that the trial court erred when it overruled his motion for a new trial based on three specific instances of improper jury conduct.

The first instance of alleged improper conduct involves statements by various jurors concerning what portion of any sentence they returned the appellant would have to serve. While there is some discrepancy in the testimony of the jurors, it appears that the following assertions were made: (1) that if the jury gave appellant two years he would be out in one year; (2) that if the jury gave appellant ten years he would be free in eighteen months; and (3) that if the jury gave appellant fifteen years he would be free in seven years.

The second alleged instance of misconduct involves the statement by one or more jurors that if they could not reach a verdict at the guilt or innocence phase of the trial the appellant would walk out of the courthouse a free man.

The third alleged instance of misconduct involves the following two statements by one of the members of the jury: (1) "If we can make an example of this defendant, it will help to stop crime in the community and make a safer place in the community in which to rear our children"; and (2) "This case is like Watergate on the television, we haven't heard all of the facts."

2. We note that in the instant case counsel for the appellant told the trial judge that he did not want the charge to the jury at the punishment stage to include any mention of the fact that the jury was not to consider the possibility of parole in reaching their verdict on punishment.

The State concedes that these statements, or statements similar to them, were in fact made during the jury's deliberation, but asserts that they are not such as will require reversal of this case.[2]

Article 40.03, V.A.C.C.P., provides, in pertinent part:

"New trials, in cases of felony, shall be granted for the following causes, and for no other:

"(7) Where the jury, after having retired to deliberate upon a case, has received other testimony . . . . .

"(8) Where, from the misconduct of the jury, the court is of the opinion that the defendant has not received a fair and impartial trial."

Some of our decisions have treated statements of jurors regarding the possible effects of parole laws as the receipt of other evidence, *Spriggs v. State,* 160 Tex.Cr.R. 188, 268 S.W.2d 191, while others have regarded it as jury misconduct, *Mays v. State,* 167 Tex.Cr.R. 339, 320 S.W.2d 13. In *Heredia v. State,* 528 S.W.2d 847, 852, Tex.Cr. App., this Court said: "We hold that either principle may apply, depending upon the facts of the case."

In *Heredia v. State,* supra, we stated that:

". . . it is common knowledge that from time to time inmates of the Texas Department of Corrections are released on parole. E. g., *Taylor v. State,* Tex.Cr. App., 420 S.W.2d 601. Consequently, the mere mention of this common knowledge would not constitute the receipt of other evidence, nor would a further discussion of it constitute receiving new evidence any more than discussion of any other matter of common knowledge by the jury. On the other hand, information may be given to the jury, by a juror or someone else, which would constitute re-

Pursuant to this request, no such instruction was included in the court's charge. This Court has said that there should always be such an instruction, *Moore v. State,* 535 S.W.2d 357, Tex.Cr.App.

ceiving other evidence. * * * [A] misstatement of the law, by being incorrect, would constitute other evidence, since by being false it certainly could not be classified as 'common knowledge.' See e. g., *Moore v. State,* 171 Tex.Cr.R. 182, 346 S.W.2d 349. The receipt of such other evidence, even if nothing further be shown such as would constitute misconduct requiring a new trial under [Art. 40.03] Section 8, on a proper set of facts could require reversal under [Art. 40.03] Section 7."

The assertions made do not square with the provisions of Art. 42.12, Sec. 15(a), V.A.C.C.P., which makes a prisoner eligible for parole only after he has served "one-third of the maximum· sentence imposed." Even if the parole law had been correctly stated as being one-third of the sentence, it is "palpably erroneous" to assume the defendant will be discharged at that time. See footnote # 4, *Sweed v. State,* 538 S.W.2d 119, Tex.Cr.App.; Art. 42.12, Section 15(c), V.A.C.C.P.

The same reasoning applies to the statement that if the jury could not reach a verdict the appellant would walk out of the courtroom a free man. This is an inaccurate statement of the law. Article 36.33, V.A.C.C.P., specifically provides that when a jury has been discharged for failure to agree on a verdict, "the cause may be again tried at the same or another term."

The statement of the juror that, "This case is like Watergate on the television, we haven't heard all of the facts," also amounted to the receipt of other evidence. This statement was an invitation to the jury to consider these "facts."

■ The juror's statement about making an example of the appellant to help make the community safe from crime presents no reversible error. See *Henderson v. State,* 163 Tex.Cr.R. 573, 295 S.W.2d 215.

■ There were three distinct instances where the jury received other evidence. The issue now becomes one of whether this error is such that the judgment must be reversed. The standard which this Court

has established for reversal requires the other evidence to have been "detrimental to appellant" before the case must be reversed. *Heredia v. State,* supra; *Marquez v. State,* 172 Tex.Cr.R. 363, 356 S.W.2d 797; *Grizzell v. State,* 164 Tex.Cr.R. 362, 298 S.W.2d 816.

■ In the instant case, the evidence is not sufficient to show that any juror relied on or was influenced by the comments in the jury room to the appellant's detriment. The most direct testimony about the effect of the statements concerning possible parole came from juror Wanda Glazner at the hearing on the motion for a new trial:

"Q And in the deliberations on the matter of punishment it is a fact, isn't it, that the range of punishment was anywhere from two to twenty years? One or more jurors wanted to assess punishment for two years and one wanted to assess as high as twenty years and it was strung out between that?

"A Yes, sir.

"Q That was in the preliminary discussion, wasn't it?

"A Yes, sir.

"Q Now, then, it is a fact, is it not, that shortly before the unanimous verdict of fifteen years was assessed that in the general discussion that Dr. Shaver or someone stated if he was given fifteen years and went down and behaved himself he would probably be out in seven years? That statement was made, wasn't it?

"A I think the question was asked.

"Q And that was answered in the affirmative, wasn't it?

"A I think so.

"Q And after that question was answered the jury agreed on fifteen years, didn't it?

"A. Yes.

"Q All right. And it was discussed very freely as to the number of years he would have to serve if he was given hard time as we lawyers call it, wasn't it?

"A We talked about it.

"Q All right.

"A No one still knew the law.

"Q I know that. We are not talking about you knew the law, but, now, then, before you agreed on the fifteen years someone of the jurors—I am not saying who—I don't know who made the statement—if he was given fifteen years and went down and behaved himself he would probably be out in seven years? That was made, wasn't it?

"A I don't remember if that was made or not.

"Q Ma'am?

"A I don't remember if that was made or not.

"Q But the time he would be down there was discussed freely before the jury agreed on fifteen years?

"A Yes, we all talked about it."

While this testimony showed that the jury assessed fifteen years, it does not reveal that the statement was the cause of the assessment. In fact, Glazner specifically testified that this was part of a discussion and that "no one still knew the law." We have reviewed the record of the hearing on the motion for a new trial and do not find any juror who testified that his or her vote was changed as a result of the discussion.

In relation to the statement regarding a hung jury, we do not find any indication that there was any reliance on it to the detriment of the appellant. No juror indicated that they had in any way considered the statement in deciding how to vote at the guilt stage of the trial or that they had changed their vote as a result of the statement.

The record does not indicate that there was any discussion of the remark that this case was like Watergate and that the jury did not know all of the facts. No juror testified that this statement had any effect on him or her.

We are unable to say that the trial judge abused his discretion in overruling the appellant's motion for a new trial. The instant case is distinguished from *Sweed v. State,* 538 S.W.2d 119, Tex.Cr.App., by the fact that in *Sweed* a juror specifically testified that he had increased his vote on punishment from fifteen to twenty years because of statements by another juror about juvenile parole laws. In the instant case there is no such evidence of any reliance to the detriment of the appellant. No reversible error is shown.

Appellant next complains about a series of "have you heard" questions used to impeach witnesses called by the defense to testify to the appellant's good reputation because such questions were "not propounded in good faith." Among the complained of questions were the following: 1. "Have you heard that Lincoln McIlveen drew a pistol on Tim Robinson in Teague?" and 2. "Have you heard that in 1967 Lincoln McIlveen rented a building—rented his building next door to his barber shop knowing it would be used for illegal gambling purposes?"

■ A witness attesting to the good reputation of the accused may be asked on cross-examination whether he has heard of acts of the accused inconsistent with that good reputation to test the witness' knowledge, if the prosecutor asks the question in good faith believing it has some basis in fact. *Sternlight v. State,* 540 S.W.2d 704, Tex.Cr.App.; *King v. State,* 491 S.W.2d 132, Tex.Cr.App.; *Gaines v. State,* 481 S.W.2d 835, Tex.Cr.App.

■ At trial the appellant's counsel made no objection on the ground of bad faith to any of the propounded questions. While similar allegations were made in the appellant's motion for a new trial, he did not develop any evidence at the hearing on the motion which would show bad faith on the part of the prosecution. Without any showing of bad faith on the part of the prosecutor in asking the questions, no error is shown.

The appellant next complains that the trial court committed error when it allowed Lucy May Dickson to testify that she had

seen the appellant draw a gun and threaten to kill Tim Robinson in 1948. Appellant contends that this injects an extraneous offense into the case. This is the same matter which was inquired into during cross-examination of the appellant's reputation witnesses.

After the reputation witnesses had been cross-examined, the appellant took the stand and testified as follows on direct examination by his own counsel:

"Q . . . Now, then, a moment ago you heard Mr. Gage ask one or more witnesses had he heard of you pulling a gun on Tim somebody. Did you pull a gun on Tim somebody?

"A No, sir.

"Q You heard him ask someone, the County Attorney asked someone had they heard of your shooting at somebody. Did you shoot at anybody besides—have you ever shot at anybody besides Cicero Watts?

"A No, sir."

After the defense had closed its evidence, the State called Dickson as a rebuttal witness. She testified that the appellant had, in fact, pulled a gun and threatened to shoot Tim Robinson in 1948.

■ The only objection that appellant made in the trial court to Dickson's testimony was that it was "too remote." Appellant does not challenge the remoteness of the offense on this appeal, but instead claims it to be an extraneous offense. Where the objection made in the trial court is not the same as that urged on appeal, appellant has not properly preserved the complaint for review. *Williams v. State,* 549 S.W.2d 183, Tex.Cr.App.; *Elizaldi v. State,* 519 S.W.2d 881, Tex.Cr.App.

■ Even if the error were before us, there was no error in the admission of Dickson's testimony. Evidence of specific acts of misconduct by a witness is not generally admissible for impeachment purposes. *Hoffman v. State,* 514 S.W.2d 248, Tex.Cr. App.; *Randolph v. State,* 499 S.W.2d 311, Tex.Cr.App. There is an exception to this rule when a witness makes a blanket statement, such as never having been charged or convicted of an offense, or never having been in trouble. *Hoffman v. State, supra; Montemayor v. State,* 543 S.W.2d 93, 94, Tex.Cr.App.

■ In *Hoffman v. State, supra,* the defendant during cross-examination denied that he had had any complaints made against him while he was a park ranger. This Court held that the defendant had opened the door, and that it was not error to elicit evidence about complaints against him which had no relation to the charge in the case.

In *Randolph v. State, supra,* the defendant, while testifying in his own behalf, made a broad denial that he had ever sold anyone heroin. The State put on witnesses who testified to extraneous sales of heroin by the defendant. This Court held that while we did not necessarily approve of the State's tactics, the defendant had opened the door and it was not error to admit testimony on the other sales of heroin.

In the instant case, the appellant's own counsel elicited the denial from the appellant which opened the door for the State to put on the testimony to prove the extraneous offense. No error is shown.

■ The appellant next complains of the following questions by the prosecutor:

"Q Isn't it correct Mr. Savoy Eastman came to your place of business and told you where to find your wife and Cicero Watts [the deceased]?

"A No.

"Q And you went directly to that spot?

"A No, sir." [3]

---

3. In his brief the appellant quotes this question as follows: "Isn't it a fact, Lincoln, that Savoy Eastman (or some name similar to Eastman) came to your barber shop and told you that if you wanted to catch Cicero Watts (the deceased) and your wife together to go down a certain country road?" Appellant never refers us to a page number in the record where this statement is to be found. After reviewing the appellant's testimony we are unable to find the exact language the appellant quotes, but will assume that he is referring to the language quoted in the opinion.

Specifically, appellant contends that "the State's Attorney did not receive such information from said Eastman, and such question was not propounded in good faith."

We first note that the appellant made no objection to the questions when they were asked, and has thus failed to preserve the error. We further note that there is absolutely nothing in the record to substantiate the appellant's claim that the prosecutor did not get the information from Eastman or that the question was asked in bad faith. On such a silent record, bad faith is not shown.

 Finally, appellant argues that if none of the errors in his brief alone constitute reversible error, "then an accumulation of the same was reversible error." Appellant thus points to various rulings of the court which we have herein found not to be reversible error. This ground of error is not in compliance with Art. 40.09, Sec. 9, V.A.C.C.P., and will not be reviewed. *Love v. State,* 533 S.W.2d 6, Tex.Cr.App.

Finding no reversible error, the judgment is affirmed.

Opinion approved by the Court.