**Archie Herman BURKHALTER,**
**Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 13–81–112–CR.**

Court of Appeals of Texas,
Corpus Christi.

Oct. 28, 1982.

Joe W. Walsh, Brownsville, for appellant.

Reynaldo Cantu, Jr., Dist. Atty., Brownsville, for appellee.

Before NYE, C.J., and BISSETT and YOUNG, JJ.

## OPINION

YOUNG, Justice.

Archie Herman Burkhalter was convicted by a jury of the attempted murder of John Hensley. The jury then assessed punishment of imprisonment for ten years. We affirm.

During the course of a three week trial, the State portrayed a complex web of relationships and events which culminated in the shooting of Hensley. Appellant has brought forward eleven grounds of error. Because the appellant challenges the admission of testimony and exhibits as well as the sufficiency of the evidence, a summary of the pertinent evidence presented to the jury is appropriate.

### I. *Background*

Archie Herman Burkhalter is a physician whose practice is in Houston. He maintained an office in Pasadena Memorial Hospital, which did business as a corporation. Dr. Burkhalter and his children owned all the shares in this corporation until his divorce from his wife, Laurita, in November of 1977. As a result of the property settlement, a division of the shares and sale of the hospital took place.

After her divorce from the appellant, Laurita went to South Padre Island, and she moved into a condominium at the South Padre Marina in March of 1978. Laurita met Hensley, a marine mechanic, who owned a business on South Padre Island, and they began dating in August of 1978.

In September of 1978, while Hensley was visiting Laurita at her home, Dr. Burkhalter called. Even though Laurita informed him that she did not wish to see him, the appellant later appeared at her door. He insulted his ex-wife and her guest until Laurita finally persuaded him to leave. She drove Hensley back to his house and returned to her own only to find that her ex-husband had forced the lock on the door. The appellant spent that evening physically and verbally abusing Laurita. While holding her in a stranglehold, Dr. Burkhalter threatened to kill Hensley.

The following morning the appellant apologized to Laurita, but negated his regret by his behaviour later in the day. He contacted Hensley and arranged a meeting in a local coffee shop. Dr. Burkhalter told

Hensley that he desired him to stop seeing Laurita and offered $5,000.00 as an inducement. Hensley refused the money and never saw the appellant again. Even so, Dr. Burkhalter thereafter harassed Hensley with frequent telephone calls.

A few weeks after this first incident, Dr. Burkhalter and a friend again broke into Laurita's home. They drugged her, forced her into a car and brought her to Pasadena Memorial Hospital. When she became conscious, the appellant tried to convince her that Hensley had beaten her up and that she had asked to be taken to the hospital. After the appellant released Laurita from the hospital at the insistence of the police, he did not engage in further violence against her. He telephoned incessantly, however, through the fall and winter of 1978–1979 to inform her that Hensley was trying to take his hospital and family from him, that Hensley was involved with dope and that Hensley was using her.

But, Laurita did not heed the appellant's advice. She and Hensley were married on October 30, 1978, and he moved in with her in the South Padre Marina condominium.

## II. *The Plot to Kill Hensley*

Dr. Burkhalter contacted a patient about hiring a private investigator to run a check on Hensley. That patient's wife, Elizabeth Schaffer, recorded a conversation she had with the investigator and reported back to the appellant. She also talked with the investigator about Hensley's credit history and marital status. The investigator's reports on the activities of Hensley were introduced at the trial. Laurita testified that her ex-husband mailed these reports to her.

The record shows that Laurita sent pictures of herself and Hensley, taken in 1978 on their vacation in Cabo, San Lucas, to Joe Reed Mason. Laurita had met Mason in 1971 or 1972, while he was a cell-mate of Dr. Burkhalter in the Harris County Jail. Both she and her ex-husband kept up their friendship with Mason, who was later incarcerated in prison at Huntsville and was still in prison through 1979. Dr. Burkhalter visited his former cell-mate several times during the winter of 1978–1979 and deposited $2,000.00 in Mason's inmate trust fund account on January 26, 1979.

Both photographs of Laurita and Hensley and notes containing information about Hensley were observed on the desk of S.J. Wilburn by his girlfriend, Emma Maldonado. Wilburn was a patient of the appellant, who had known him since they were in high school together. Wilburn was also an ex-convict, who had recently been released on parole from the Texas Department of Corrections. Shortly after his release, he entered Pasadena Memorial Hospital as a patient of Dr. Burkhalter and continued to visit the doctor after this hospital stay. In addition to seeing the doctor in person, he also called him frequently. The Pasadena Memorial employee who sent out Dr. Burkhalter's bills never sent one to Wilburn for the visits.

Dr. Burkhalter wrote a letter to Wilburn's parole officer advising rest and recreation for Wilburn. This letter supported Wilburn's application for a travel permit to Corpus Christi. When he took the trip, instead of going to Corpus Christi, Wilburn traveled to Port Isabel and to South Padre Island. His girlfriend, Emma, and her roommate accompanied him. They went to some condominiums and a marina several times and Wilburn took pictures of the area.

After the initial trip in December, Wilburn returned to South Padre Island in January. He later repeated his visits to the same condominiums and marina. Meanwhile, at Wilburn's request, several of his friends in Houston were arranging for the purchase of a rifle and the rental of a storeroom.

In mid-February, Wilburn made a third trip to South Padre Island with his nephew Scott Minnick. He wrote letters to Emma describing his activities, including his phone calls to Dr. Burkhalter, referred to as "Dr. B," and "the doctor."

Carmen Garcia, a friend of Wilburn, who lives in Raymondville, testified that he made and received telephone calls at her house. Although the person who called

Wilburn there did not identify himself, Southwestern Bell records show that a call was made to Ms. Garcia's number from the appellant's brother's phone. Also, Wilburn boasted to an employee of the Bahia Mar resort that he was expecting a phone call from his physician, who was well-known in Houston and so expensive that his services would be unaffordable to Wilburn had they not gone to school together. The employee, Russell Buford, recalls that Wilburn made this statement the morning of the shooting. He later observed Wilburn taking a phone call in the hotel lobby.

Local residents and business people noticed Wilburn and a red Cadillac in the condominium and marina areas. Some were able to identify him and others identified the car. The car is quite noticeable because it was modified to allow an occupant to fire a shot through portholes cut in the trunk lid. A passageway was constructed from the interior of the car to the trunk by removing the backseat. This seat was later found by police in the storeroom Wilburn caused his friends to rent on his behalf.

On February 15, 1979, two phone calls were made from the Sea Ranch Motel and Bahia Mar pay phones to Pasadena Memorial Hospital. In that regard, Buford testified that Wilburn had asked him for change for a long distance phone call that morning. An hour later, as Hensley was leaving his condominium to go to work, he was shot in the face. At the sound of the shot, Laurita ran from the house. She saw her husband lying on the ground and a red Cadillac driving away from the parking lot. Witnesses, who appeared immediately after the shot, noted the license plate number. The bullet which hit Hensley tore through the upper part of his face, leaving him permanently blind.

### III. *Post-Shooting Events*

On the morning of the shooting, Crystal Hutson, a fourteen year-old girl on her way to school, saw a red Cadillac stopped on the causeway between South Padre Island and Port Isabel. She observed a man throwing two packages off the bridge. Crystal wrote down the license number and gave it to her father, who reported it to the police. The police apprehended Wilburn who was driving north in the red Cadillac. In a subsequent search of the bay below the bridge, the police found a rifle. The rifle was identified by Wilburn's friends as the one they purchased for him.

The police arrested Wilburn, took him to the South Padre Island police station and later to the Cameron County Jail. From there, Wilburn began sending letters to his girlfriend Emma. Many of these letters mention "the doctor." One of them contains a thinly veiled allusion to a plan to destroy the red Cadillac. Another told Emma to look for his black wallet and photos and to give them to his attorney. A third instructed Emma to be sure that the rent on the storeroom was paid in order "to cover all tracks." Emma did not reply to these letters nor did she perform any of the errands which Wilburn exhorted her to do.

One of the most frequent requests in the letters was for her to get in touch with the doctor in order to keep him informed. Wilburn urged Emma to bring the matter of the locker rental payment to the doctor's attention. He also told her to warn Carmen that the police might be checking on her since he made so many phone calls from her house. Emma consented to the use of these letters at the appellant's trial. Other letters to Emma, typed notes, the pictures of Laurita and Hensley, and a typed report and handwritten note containing information about Hensley were all seen by her on Wilburn's desk in his bedroom. These materials were turned over to the police by a Houston reporter, who acquired them by following instructions given by an anonymous female caller. A fingerprint on the briefcase containing these papers was identified as Wilburn's. At the trial, witnesses identified the writing on one exhibit, the memorandum containing information about Hensley, as the handwriting of the appellant.

All of which brings us to a summary of the State's theory of proof of Dr. Burkhalter's guilt. Dr. Burkhalter developed a ha-

tred for Hensley, obtained his picture from Mason and furnished the picture and an investigative report on Hensley to Wilburn. The appellant entered into an agreement with Wilburn to kill Hensley. By providing the picture and report on the intended victim, Dr. Burkhalter assisted in the commission of the offense. The jury accepted the State's theory.

## IV. Resolution of Appellant's Points of Error

In grounds of error one through six and eight, the appellant contends that since much of the evidence introduced was inadmissible, there was insufficient admissible evidence to convict him. The first ground of error challenges the admission of exhibits that consisted of letters to Emma by Wilburn and typewritten notes made by Wilburn. During the trial, the appellant objected that these were hearsay and, therefore, inadmissible.

 The acts and declarations of one conspirator during the course and in furtherance of the conspiracy are admissible against the other conspirators if there is independent evidence which tends to establish the existence of a conspiracy. *Denney v. State*, 558 S.W.2d 467, 469 (Tex.Cr.App. 1977). Thus, if the State proved the existence of a conspiracy between the appellant and Wilburn, all of Wilburn's statements made during and in furtherance of the conspiracy are admissible against Dr. Burkhalter. The appellant argues that the prosecution did not prove that the two men conspired.

As the Court of Criminal Appeals has noted in past decisions, it is difficult to prove a conspiracy: "The existence of a conspiracy can seldom, if ever, be shown by direct and positive evidence. Their work is done in secrecy and under cover. Consequently, resort must be had to circumstances from which the existence of the conspiracy is logically deducible. Therefore, the conspiracy cannot, as a general rule, be shown by one witness or one circumstance; but by many which, when connected up and woven into a chain, connect the parties in their unholy alliance." *Grant v. State,* 140

Tex.Cr.R. 46, 143 S.W.2d 383, 384 (Tex.Cr. App.1940).

 Any single piece of evidence in this case is not very incriminating. When each fact is considered, however, as a link in a chain, the conclusion that there was a conspiracy is justified. Thus, any of Wilburn's statements are admissible against the appellant, if they were made before the termination of the conspiracy. There were letters written by Wilburn to Emma shortly before the shooting and, therefore, they were all clearly admissible against Dr. Burkhalter as statements of a co-conspirator.

 Statements made by conspirators for the purpose of disposing of fruits of the crime and evidence that a crime has been committed are in furtherance of the conspiracy and admissible against co-conspirators. *Denney v. State,* supra at 469. Acts or statements made after the completion of a conspiracy, however, are not within the co-conspirator exception to the hearsay rule. *Delgado v. State,* 544 S.W.2d 929, 931 (Tex.Cr.App.1977). The State argues that letters written after the shooting by Wilburn to Emma from the Cameron County Jail were efforts to conceal and destroy the evidence. The appellant contends that any conspiracy automatically terminated when Jay Wilburn was arrested because Wilburn himself was not capable of disposing of the evidence. He also makes much of Emma's admission that she did not follow the directions in the letters.

 We do not believe that a conspiracy automatically terminates when the police apprehend one of the conspirators. Of course, if they are all incarcerated, they could do little to dispose of the evidence. When only one is in jail, he can direct the others to conceal the crime as was done in this case. The appellant maintains that our holding that a conspiracy can still exist after one conspirator has been arrested would extend indefinitely the time within which hearsay declarations will bind co-conspirators. This is not necessarily so. The hearsay exception would apply only to those

statements made in furtherance of the conspiracy. The directions to show the letters to the appellant, to destroy the car, to pay the rental on the storeroom, to locate a wallet and photos and turn them over to Wilburn's attorney and to warn Carmen not to talk to the police about phone calls between Wilburn and the appellant are all efforts to conceal evidence which would incriminate both Wilburn and the appellant. Therefore, the statements were made in furtherance of the conspiracy. As to the lack of evidence that any of these instructions were actually carried out, we do not believe this precludes the continuing existence of a conspiracy. The first ground of error is overruled.

In grounds of error two through five, the appellant complains that the trial court erred in admitting Wilburn's statements testified to by various witnesses. These statements were all made during the course and in furtherance of the conspiracy and were, therefore, admissible.

In grounds of error six and eight, Dr. Burkhalter complains that the trial court erroneously denied his motion for instructed verdict because there was insufficient evidence for the case to go to the jury. The eighth ground of error argues that the State failed to prove either venue, or that the appellant acted as a principal in the commission of the offense or that the appellant had the requisite intent.

Tex.Code Crim.Proc.Ann. art. 13.18 (Vernon 1977) provides that the proper county for the prosecution of an offense is the county in which the offense was committed. The State introduced believable evidence that the shooting occurred on South Padre Island, which is in Cameron County. The appellant urges that the State was required to prove that he personally committed acts within Cameron County. This is incorrect. Proper venue for the trial of all parties to a crime is the county in which it was committed regardless of whether all the parties did any acts within that county. *Baker v. State,* 124 Tex.Cr.R. 300, 62 S.W.2d 132, 135 (Tex.Cr.App.1933).

In a novel argument, Dr. Burkhalter contends that the State was required to prove that he acted as a principal as defined by the former Penal Code because the indictment used language similar to that used under that Code. Tex.Penal Code § 7.01(c) (1974) abolishes the distinctions between principals and accomplices. To prove that an accused is criminally responsible for the conduct of another, the State must satisfy the requirements of the *current* Tex.Penal Code § 7.02 (1974). We believe that was done in this case.

Next, the appellant claims that the prosecution failed to prove he acted with intent to kill Hensley. The evidence established that the appellant assisted a man who shot Hensley in the face. Intent to kill may be inferred from the use of a deadly weapon. *Windham v. State,* 162 Tex.Cr.R. 620, 288 S.W.2d 90 (Tex.Cr.App. 1956). There was sufficient proof of intent to kill.

In his sixth ground of error, the appellant argues that the letters of Wilburn are the only evidence which incriminates him, that these letters are inadmissible hearsay, and, therefore, there was insufficient evidence to convict him. Dr. Burkhalter also argues that the letters of Wilburn are inadmissible because they constitute uncorroborated accomplice testimony. We have already noted that there was evidence apart from Wilburn's statements which tended to show an agreement to kill Hensley. Our review of the evidence also shows that specific statements made by Wilburn were verified by investigation. One example is the reference to telephone calls between Wilburn and the appellant from Carmen Garcia's home number which was later substantiated by her testimony and telephone company records. We have examined the testimony and exhibits thoroughly and find the evidence sufficient to sustain a conviction. Grounds two through six and eight are overruled.

The seventh ground of error offers an unusual assertion. The appellant argues that provisions of the Texas Penal Code

which authorize prosecution of parties to crimes are inapplicable when the crime is an attempt. Following this reasoning, the appellant's position is that he could be charged as a party to a murder if Hensley had died, but because the victim lived, the State could only charge him as a party to an aggravated assault.

Chapter 7 of the Penal Code sets forth the rules of criminal responsibility for the conduct of another. Chapter 15 deals with preparatory offenses. Pertinent provisions appear below:

"Tex.Penal Code § 7.01

(a) A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

(b) Each party to an offense may be charged with commission of the offense.

Tex.Penal Code § 7.02

(a) A person is criminally responsible for an offense committed by the conduct of another if:

(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, and aids, or attempts to aid the other person to commit the offense.

Tex.Penal Code § 15.01

(a) A person commits an offense if, with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended."

The facts of this case make it quite clear that Wilburn could be convicted of attempted murder. Since there was evidence which established that the appellant encouraged and assisted Wilburn in the commission of the offense, the appellant may be charged as a party to the offense. Thus, the indictment properly charged Dr. Burkhalter with the commission of an attempted murder. The seventh ground of error is overruled.[1]

Counsel for the appellant adopts a rather unorthodox numbering system in his ninth ground of error (9.1, 9.2, 9.3, 9.4, 9.5, 9.6, and 9.7). In the single ground, he alleges several mistakes in the indictment. Although this technique may not be in strict compliance with the briefing requirements of Tex.Code Crim.Proc.Ann. art. 40.09, the arguments are sufficiently distinct to enable us to address them.

■ The appellant was convicted under the first count of the indictment which omitting its formal portions, reads as follows:

"... Archie Herman Burkhalter, also known as Doc., Dr., Doctor, Doctor B and Doc B, and Scott David Minnick and S.J. Wilburn, also known as Jay Wilburn, on or about the 15th day of February 1979, ... did then and there unlawfully with specific intent to commit the offense of murder, attempt to intentionally and knowingly cause the death of an individual, John W. Hensley, by shooting him with a gun, said attempt amounting to more than mere preparation that tends but fails to effect the commission of the offense intended."

The first purported defect in this indictment which the appellant sets out is that it pleads separate offenses in a single paragraph in violation of Tex.Code Crim.Proc. Ann. art. 21.24 (1965). He explains that accusing him together with the other parties to the offense in the same paragraph is impermissible. Our reading of the indictment leads us to conclude that it charges three people with a single offense. There is no error in this form of pleading.

■ The next difficulty which the appellant alleges is that the indictment fails to specify the meaning of "specific intent to commit the offense of murder." The indictment, and the charge given the jury, clearly uses the language of Tex.Penal Code § 19.02(a)(1) in charging that the appellant intentionally or knowingly attempted to

---

1. The Court of Criminal Appeals upheld the conviction of a party to an attempted murder in *Ashabranner v. State*, 557 S.W.2d 774 (Tex.Cr. App.1977).

cause the death of Hensley. This argument is without merit.

■ The third aspect in the indictment, which the appellant brings to our attention, is its failure to charge that he did an act that amounted to mere preparation, which tended but failed to effect the commission of the offense intended. The indictment does charge an act: shooting Hensley with a gun. Apparently, the appellant believes that the indictment is sufficient only if it pleads an act which he did personally. *Pitts v. State*, 569 S.W.2d 898, 900 (Tex.Cr.App. 1978), held that a person may be properly charged as a party to an offense without alleging the facts which make him criminally responsible for the conduct of another. This complaint is without basis.

■ Next, Dr. Burkhalter complains that it was error not to specify that he was being charged as a party. It is unnecessary to allege that an accused is being charged as a party in the indictment. *Pitts v. State*, supra at 900. We have considered all the arguments set forth in the ninth ground of error and we overrule all of them.

The tenth ground of error contends that the trial court erred in denying the appellant's motion to dismiss the indictment because insufficient evidence was presented to the Grand Jury to support a finding of probable cause. The motion to dismiss alleged that no witnesses testified before the Grand Jury and no competent evidence was presented to the Grand Jury; instead, a member of the district attorney's staff explained to the Grand Jury that there was a defect in the prior indictment.

■ Prior to trial, assistant district attorney, Randy Friebele, testified that he explained to the Grand Jury the necessity of a new indictment in lieu of the prior indictment. He summarized the evidence which had been presented to the preceding grand jury.

■ It is not reversible error for the district attorney to present the evidence to the Grand Jury. *Forbes v. State*, 513 S.W.2d 72, 77 (Tex.Cr.App.1974). This Court will not go behind the actions of the Grand Jury to determine whether sufficient evidence existed to justify the return of an indictment. *Tarpley v. State*, 565 S.W.2d 525, 532 (Tex.Cr.App.1978), *Carpenter v. State*, 477 S.W.2d 22, 23 (Tex.Cr.App.1972). When a legally constituted Grand Jury returns an indictment which is valid on its face, it is sufficient to call for a trial on the merits. *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). For these reasons the tenth ground of error is overruled.

■ The final ground of error claims that the trial court should have granted the appellant's motion to dismiss for failure to provide a speedy trial. To address this argument we must give a brief history of the indictments involved in this case.

The first indictment charging the appellant, Wilburn and Scott Minnick with attempted murder was handed down on April 5, 1979. At a hearing held on May 2, 1979, all parties agreed to sever the case as to Wilburn and to assign a new number to the case. Dr. Burkhalter waived the right to a speedy trial as to this indictment.

While the first indictment was still in effect, the Grand Jury handed down another indictment. This occurred on July 11, 1979. At his arraignment on July 24, 1979, the appellant waived his right to a speedy trial. On July 30, 1979, the first indictment was dismissed.

The indictment upon which the appellant was tried was handed down on October 22, 1979. There was no waiver of a speedy trial. But, the trial took place only a week later. The second indictment (the one handed down in July) was dismissed after the trial.

While the provisions of the Speedy Trial Act, Tex.Code Crim.Proc.Ann. art. 32A.02 (Vernon 1982) specifically address the ramifications of a re-indictment after the initial indictment is dismissed on motion of the defendant, the statute is silent on the effect of a dismissal by the State. Although the statute itself does not give us express guidance, its interpretation by the Court of Criminal Appeals furnishes us with a solu-

tion to this problem. In *Durrough v. State,* 620 S.W.2d 134 (Tex.Cr.App.1981), the defendant waived the right to a speedy trial when first indicted. Before the first indictment was dismissed, the appellant was indicted a second time. He did not waive his right to a speedy trial on the second indictment. The Court rejected his contention that the waiver executed for the first indictment was inapplicable to the second. *Durrough,* supra at 139.

The holding in *Durrough* means that in our case the waiver of speedy trial for the first indictment was effective as to the second indictment and the waiver of speedy trial to the second indictment was effective as to the indictment on which the appellant was tried. The eleventh ground of error is overruled.

The judgment of the trial court is affirmed.