Teresa Freeman **WORTHAM**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 09–87–059 CR.

Court of Appeals of Texas,
Beaumont.

April 27, 1988.

Julie A. Owens, Lufkin, for appellant.

Gerald Goodwin, Dist. Atty., and Art Bauereiss, Asst. Dist. Atty., Lufkin, for appellee.

## OPINION

DIES, Chief Justice.

Appellant was convicted by a jury of delivery of a controlled substance. All evidence in the guilt-innocence phase was presented to a jury on November 13, 1986. Appellant was not present. The jury found her guilty on November 14, 1986, when she was present, and the court, on February 25, 1987, assessed her punishment at fifteen years in the Texas Department of Corrections. Appeal has been perfected to this court.

Point of error number one:

"The Trial Court erred in proceeding to trial in the absence of Appellant, in violation of the 'confrontation clause' provided for in U.S. CONST. amend. VI and amend. XIV, TEX.CODE CRIM.PROC. ANN., art. 33.03 and art. 40.03(1), and TEX.R.APP.PROC. 30."

On November 3, 1986, the case was called for trial. A jury was selected and sworn in the presence of Appellant and her attorney. Thereafter, the trial court instructed the jury to return on November 6, 1986. When that date came, the State announced "not ready" because of the unavailability of Detective Collins, the State's key and indispensable witness. Appellant objected to a continuance but it was granted anyway and the case reset—with the same jury—for November 13, 1986, one week later. The court reduced Appellant's bond and she was released from jail. The court informed Appellant that the trial was reset for November 13, 1986. On November 13, 1986, Appellant's attorney appeared but Appellant did not. The State announced "ready"; Appellant's attorney orally moved for continuance based on the absence of Appellant. The court denied the motion and the State proceeded with its evidence. Appellant was arrested and appeared in court on November 14, 1986. On November 14, 1986, the jury returned a verdict of guilty. The punishment phase was heard February 25, 1987, resulting in the sentence already noted herein.

■ Appellant correctly states that the Texas and United States Constitutions, as well as *TEX.CODE CRIM.PROC.ANN. art. 33.03* (Vernon Pamph.Supp.1988), protects a defendant's right to confrontation by requiring that the defendant be personally present at trial. However, this right may be waived. *Miller v. State*, 692 S.W. 2d 88 (Tex.Crim.App.1985); *Gonzales v. State*, 515 S.W.2d 920 (Tex.Crim.App.1974).

In *Miller v. State, supra*, the Court of Criminal Appeals affirmed this court [623 S.W.2d 491 (Tex.App.—Beaumont 1981)] and wrote, at 91:

"Under Article 33.03, supra, by contrast, an accused's right to be present at his trial is unwaivable until such a time as the jury 'has been selected.'"

In *Gonzales v. State, supra*, the appellant who was free on bail was present in court during the selection of the jury and entered a plea of not guilty. He failed to appear in court the next morning. The court proceeded with the trial. The court wrote, at 921:

"The Appellant waived his right to be personally present at the trial."

Appellant's excuse in the case at bar for not being present at the trial is not sufficient. This point of error is overruled.

Appellant's next point of error contends violation of the Speedy Trial Act, *Tex.Code Crim.Proc.Ann. art. 32A.02*. This Act has been held unconstitutional in its entirety. *Meshell v. State*, 739 S.W.2d 246 (Tex.Crim. App.1987). This point of error is overruled.

■ Appellant next contends the trial court committed reversible error in continuing the case from November 6 to November 13. The motion was based upon the unavailability of the undercover agent, Detective Collins, to whom Appellant delivered the cocaine. Collins had previously advised a prosecutor he would be available to testify; hence, the State did not need to subpoena him. It is within the sound discretion of a trial court in Texas to grant or deny a continuance. *Hernandez v. State,* 492 S.W.2d 466, 467 (Tex.Crim.App.1973). This point is overruled. *See also, Ashabranner v. State,* 557 S.W.2d 774, 778 (Tex. Crim.App.1977). This point is overruled.

■ The fourth point of error contends the trial court erred when Appellant's submitted charge on mistaken identity was denied. A part of the court's charge follows:

"You are instructed that the State has the burden to prove beyond a reasonable doubt that the Defendant, Teresa Freeman Wortham, is the party who committed the offense as alleged in the indictment, and unless they have so proved beyond a reasonable doubt, you should acquit the Defendant."

We hold this charge was sufficient. Further, there is no evidence of misidentification, and the latter is not an affirmative defense. *See Wilson v. State,* 581 S.W.2d 661, 664–65 (Tex.Crim.App.1979); *Waller v. State,* 581 S.W.2d 483, 484 (Tex.Crim.App. 1979); *Laws v. State,* 549 S.W.2d 738, 740 (Tex.Crim.App.1977); *Roy v. State,* 627 S.W.2d 488, 490 (Tex.App.—Houston [1st Dist.] 1981, no pet.). This point of error is overruled.

■ The fifth point of error raises double jeopardy. It is undisputed that when trial is before a jury, jeopardy attaches when the jury is impaneled and sworn. The reason lies in the need to protect the interest of an accused "in retaining a chosen jury." *Crist v. Bretz,* 437 U.S. 28, 35, 98 S.Ct. 2156, 2161, 57 L.Ed.2d 24, 31 (1978); *Torres v. State,* 614 S.W.2d 436, 441 (Tex.Crim.App.1981). In the case at bar, the guilt-innocence phase was tried by the same jury and the same judge presided over the entire trial; hence, Appellant's trial was completed by the same tribunal, with only an interruption. *See Downum v. U.S.,* 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100, 102 (1963). *See also, McClendon v. State,* 583 S.W.2d 777, 780 (Tex.Crim.App.1979). This point of error is overruled.

■ Points six and seven attack the sufficiency of the evidence at the trial to identify Appellant. This test is delineated in *Miller v. State,* 667 S.W.2d 773, 775 (Tex. Crim.App.1984), and *Purkey v. State,* 656 S.W.2d 519, 520 (Tex.App.—Beaumont 1983, pet. ref'd). Appellant was identified by Detective Collins (who had seen her often before) and two other witnesses.

In view of the dissent, we herewith copy from the statement of facts portions of Officer Collins' testimony:

"Q. [BY PROSECUTOR] Calling your attention, again, to the 20th day of May, 1986, were you working on that date?

"A. [BY OFFICER COLLINS] Yes, sir, I was.

"Q. Did you have an occasion on that date to see a person by the name of Teresa Freeman Wortham?

"A. Yes, sir.

"Q. How did you happen to see her that day?

"A. She was at a place down on the front that everyone called the Chicken Shack. A building, that possibly in earlier days was used as a restaurant, but the building—

"Q. Are there a lot of people that do sit around that building?

"A. Oh, yes, sir, there is.

"Q. Is it a business at all? Is there anything actually sold there other than narcotics?

"A. Only thing I saw sold there was beer. They was bootlegging beer from there also.

"Q. When we're talking about the front, would you describe this area and tell the jury, if you will, what the front actually is?

"A. In my opinion, the front is an area where it's a high crime area, a little bit. Mostly narcotic dealers and pushers and users are down there.

"Q. Did you frequently work this area when you were in Angelina County?

"A. Yes, sir, I did.

"Q. Did it live up to it's name or your description that you just gave it? Is it a high concentration of narcotic sales?

"A. Yes, sir, very much, it is.

"Q. Back on May 20, you say you saw Teresa Wortham instead of saying Teresa Freeman Wortham?

"A. Okay, yes, sir.

"Q. We're talking about the same person? You say you saw her on that date?

"A. Yes, sir, I did.

"[PROSECUTOR]: May I approach the bench, Your Honor?

"THE COURT: You may.

"Q. [BY PROSECUTOR] Mr. Collins, I believe my last question—and I may have asked this twice already, you did see Teresa Wortham on that date?

"A. Yes, sir, I did.

"Q. Did you know her already before that date?

"A. Yes, sir, I did.

"Q. How did you happen to know her?

"A. I seen her, say, many occasions, at least ten times. She would always be around with a lot of dope transactions. She would offer me—she would want to sell herself off as prostitution to me several times.

"[DEFENDANT'S ATTORNEY]: Your Honor, I'm going to object on this kind of stuff that she's not charged with. It constitutes hearsay.

"[PROSECUTOR]: Your Honor, I would just offer testimony.

"THE COURT: I'm going to over-rule that objection.

"Q. [BY PROSECUTOR] Had you conversed with her on other occasions?

"A. Yes, sir, I talked with her several times.

"Q. Had you ever ridden in a vehicle with her, or she in a vehicle with you?

"A. Yes, sir, I have.

"Q. On November 20, she certainly wasn't a stranger to you?

"A. No, sir, she wasn't.

"Q. What occurred November 20— that's May 20, 1986. What occurred on that date when you saw her?

"A I drove to the place that she called the Chicken Shack, parked the car and started talking to the people out under the shed there. Teresa came out and asked me to step inside.

Once inside she asked me if I wanted any beer. I told her, 'No, I didn't want any beer.' She asked me about the 'coke' deal I had made previous that she had rounded up, then she asked me if anything came down. I told her I bought some 'coke.' She stated she could get me some better than I had bought before.

"Q. Did you take her up on it?

"A. Yes, sir, I asked her what the price would be on it. She said $50.00.

"I said, 'Okay. I would buy it.'

"Q. What then?

"A. I then gave her the money. She said she had to go get it, to stand back outside, which I did. I left from inside the building, went back outside. Approximately five minutes later, she called me back in.

"Q. Did you then go back inside?

"A. Yes, sir. Back inside she had two packets of cocaine.

"Q. How was that transacted at that time?

"A. She was sitting at a table, makeshift table she had inside the place. We was talking about the size of 'coke' she had. She stated she wanted the bigger bag for herself. She was going to give me the smaller bag. About that time another black female came inside the building. She kind of looked at her, told her she was doing business, told her to leave. At that time, she told me to pick which size I wanted, which bag.

"Q. At that time was it just you and her seated at the table?

"A. Yes, sir.

"Q. Was there anyone else in the Chicken Shack before the other black female came in?

"A. No, sir, there wasn't.

"Q. Had you already given her money for that?

"A. Yes, sir, I did.

"Q. Did you give her the money prior to her calling you back inside?

"A. Yes, sir.

"Q. Okay. You saw there was two packets laying on the table?

"A. Yes, sir, there was.

"Q. Did you take one of those?

"A. Yes, sir, I did.

"[PROSECUTOR]: I want that marked as State's Exhibit Number 1.

(Whereupon, State's Exhibit Number 1 was marked for identification by the Court Reporter.)

"Q. [BY PROSECUTOR] Mr. Collins, if you will look at what has been marked as State's Exhibit Number 1. I will ask if you would open that and see if you recognize any of the contents?

"A. Yes, sir, I can.

"Q. Okay. What is it that you recognize in State's Exhibit Number 1?

"A. This is a brown envelope containing my writing with Teresa Freeman's name, 2:00 p.m. It will be one paper of cocaine and on the back would be my initials when I sealed it.

"Q. Okay. After you got the cocaine, what did you do with it?

"A. After I got the cocaine from Teresa, I then got in my vehicle. I left, went down the street, put the cocaine in this envelope right here and sealed it, placed it back inside the locked briefcase I had in the trunk of my vehicle and locked it back in the trunk.

"Q. Was that in your custody at all times until you later delivered it somewhere?

"A. Yes, sir, it was.

"Q. What did you do with it? Where did you take the contents and everything?

"A. I submitted an offense report to this incident.

"Q. Did you give him the contents of State's Exhibit Number 1?

"A. Yes, I did.

"Q. If you will open up, further, the second envelope which was in State's Exhibit Number 1 and see if you can identify the contents of that.

"A. This is inside this evidence envelope here is one aluminum foil. This aluminum foil contains the cocaine which was taken out of this bag right here by the chemist.

"Q. That's the aluminum foil on that card (indicating)?

"A. Yes, it is.

"Q. Then you have a small bag with the substance in it?

"A. Yes, sir.

"Q. What was it that you actually placed in the envelope?

"A. It was an aluminum foil containing a white substance, cocaine.

"Q. Oh, the little plastic bag wasn't in it when you placed it in there?

"A. No, sir.

"Q. Was the card in there?

"A. No, sir, it wasn't.

"Q. Is the aluminum foil marked in any way?

"A. No, sir, it's not.

"Q. But you placed it in that bag?

"A. Yes, sir, I did.

"Q. That aluminum foil is consistent with the same packet of aluminum foil that you placed in it that day?

"A. Yes, sir, it is.

"Q. Mr. Collins, did this occur here in Angelina County, Texas?

"A. Yes, sir, it did.

"Q. When she sold you the contents of State's Exhibit Number 1, when the transaction was going down, did she tell you

what it was, or did y'all discuss what she was buying?

"A. Yes, sir, she knew exactly what it was.

"Q. After that date, did you have occasion to see her?

"A. Yes, sir, I seen her several times after that.

"Q. Where did you see her?

"A. In the same location. Also the night that we made the arrest, I arrested her that same night.

"Q. On the other occasions at the same location, did you talk to her then?

"A. Yes, sir, she would be at the same location or across the street at Shotgun Hill. She would be there. I talked to her all the time.

"Q. During your work here at Angelina County, did she become well known to you?

"A. Yes, sir, she did.

"Q. You were present the night she was arrested?

"A. Yes, sir.

"Q. How did you happen to arrest her?

"A. We was looking for another guy that we had indictments on. We pulled up to a local motel over here, and one of the guys got out of the car that was with Mrs. Freeman. We told him we was looking for this other gal. He stated he hadn't seen her, but he had Teresa Freeman in his car.

"We walked around to the back of the motel. She was hiding in the car. I arrested her out of the car.

"Q. Did you speak to her?

"A. Yes, sir. I said, 'You remember me, Teresa?' She said, 'Yeah, I sure do.'

"Q. Did she make any further statement at the time of her arrest then?

"A. Yes, sir. She stated, 'I figured you was "The Man." I just couldn't put it together.' "

On cross-examination, Officer Collins gave the following testimony:

"Q. [BY DEFENDANT'S ATTORNEY] So you just said it was Teresa Wortham and you left it with the D.A.'s Office or Sheriff's Department after that?

"A. [BY OFFICER COLLINS] Yes, ma'am.

\* \* \* \* \* \*

"Q. Have you ever mistaken the identity of Teresa Wortham before, Mr. Collins?

"A. No, ma'am.

\* \* \* \* \*

"FURTHER DIRECT EXAMINATION

"[BY PROSECUTOR]:

"Q. Can you think of any reason, whatsoever, that you would want to testify and say that Teresa Wortham did sell drugs if she didn't?

"A. No, sir, it isn't."

There was no serious attempt by Appellant to show that Officer Collins purchased the cocaine from anyone other than Appellant. The nearest thing to this were questions on cross-examination which established that another female was present during part of the transaction.

*McCowan v. State*, cited in the dissent is not in point. That case simply holds, inter alia, that the State must prove that the person before the court in a revocation hearing is the same person who was previously placed on probation. These points of error are overruled.

■ Point of error number eight complains of the district attorney's cross-examination of a defense witness. The witness was asked whether she knew she could receive a sentence of as much as ninety-nine years for an offense for which she had been charged and pled guilty.

The question was invited because Appellant's counsel had established on direct that the witness had pled guilty and was awaiting sentencing. Also, Appellant made no objections so error, if any, was waived. *Crocker v. State*, 573 S.W.2d 190, 205 (Tex. Crim.App.1978); *Moon v. State*, 465 S.W.2d 172, 173–74 (Tex.Crim.App.1971). This point of error is overruled.

The Appellant has one further point which we have considered and find to be without merit. It is overruled.

The judgment of the trial court is affirmed.

BURGESS, Justice, dissenting.

I respectfully dissent from the majority's disposition of points of error numbers six and seven. While *Miller v. State,* 667 S.W. 2d 773 (Tex.Crim.App.1984) and *Purkey v. State,* 656 S.W.2d 519 (Tex.App.—Beaumont 1983, pet. ref'd) are similar cases, there is a vital difference between them and this case. In the instant case, the issue of identity was contested. Appellant cross-examined the undercover officer on the issue of misidentification or confusion of identities. Further, appellant produced direct testimony from a witness that the undercover officer had, on a previous occasion, mistaken the witness for appellant. I find nowhere in the record where the undercover officer made an in-court identification of appellant as the individual who delivered the controlled substance. It is true that the officer and other witnesses continually referred to the individual who delivered the substance by the use of appellant's name. This, in this circumstance, is insufficient. The burden is upon the state to prove that the individual in the courtroom is both the individual named in the indictment and the individual who committed the offense. The state failed in the latter. *See McCowan v. State,* 739 S.W.2d 652, 655 (Tex.App.—Beaumont 1987, pet. pending). Because the majority overrules these points of error, I respectfully dissent.