Joe Edgar ASHABRANNER, Appellant,

v.

The STATE of Texas, Appellee.

No. 53184.

Court of Criminal Appeals of Texas.

Nov. 16, 1977.

Kenneth G. Raggio, Austin, for appellant.

Robert O. Smith, Dist. Atty. and Stephen H. Capelle, Asst. Dist. Atty., Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

GREEN, Commissioner.

In a trial before a jury appellant was convicted of attempt to commit murder. See V.T.C.A. Penal Code, Sec. 15.01(a). Punishment was assessed at twenty years.

Appellant challenges the sufficiency of the evidence to support the verdict.

The record reflects that at about 4:30 a. m. on August 30, 1974, Leonard McCaskill was shot and severely wounded by Joe Pruett, a co-indictee also charged with this offense. Appellant was present at the scene of the shooting. He contends that the evidence is insufficient to prove that he was criminally responsible for the conduct of Joe Pruett. See V.T.C.A. Penal Code, Secs. 7.01 and 7.02.

McCaskill, the injured party, testified substantially as follows:

In 1974, prior to his being shot, he, appellant and Bob Palamas were "sort of partners" in selling and dealing in methamphetamine, commonly known as "speed." McCaskill also was a "speed" addict. The partnership "soured" about a week before August 30 when McCaskill told appellant that the "dope" appellant was furnishing was not methamphetamine, but was just "trash—fertilizer." At that time McCaskill owed the partnership a sum variously estimated at between one hundred and two hundred eighty dollars. When McCaskill told him that the dope was merely trash or fertilizer, appellant stated: "Lenny, something bad is going to happen to you."

At about 3:00 o'clock a. m. on August 30, while McCaskill was shooting pool in the Sit N'Bull restaurant in Austin, appellant entered with Joe Pruett, and in a conversation it was arranged that they would go sell some "speed" to an individual who McCaskill knew wanted to buy some. After McCaskill phoned the person and made arrangements to meet him, he, appellant and Pruett left in the latter's car to complete the sale. They stopped at an apartment, where McCaskill was given an injection of "speed." There Mike Stewart joined them, and they proceeded to the place where the sale was to be made. Appellant and McCaskill left the car and saw the customer, who paid McCaskill one hundred and eighty dollars. On going back to Pruett's car to get the "speed," they noticed a car stop near them, and, fearing it contained narcotic officers, appellant and McCaskill got in the car with Pruett and Stewart, and they left without delivering the speed. They rode about a mile out of Austin, and when McCaskill asked where they were going, appellant, in the front seat with Pruett,

said: "Don't worry about it; it's cool." Later, Pruett stopped the car on a country road and ordered everybody out. McCaskill and Stewart got out, but Stewart got back in the car on the front seat with appellant. Pruett then ordered McCaskill to go behind the car, where Pruett shot him several times with a Magnum .44 caliber pistol. The others then left. The next morning McCaskill was found lying badly wounded near the road. He spent six weeks in the hospital as the result of being shot in the chest, abdomen, and right arm.

Mike Stewart testified that at about midnight or shortly thereafter on the night of the shooting, while he was alone in the apartment of a girl friend, appellant and Johnny Pruett came there together. After staying there for about three hours, someone went to get Leonard McCaskill. Stewart, who had been drinking beer and was a bit hazy as to details, didn't remember who went for McCaskill or exactly what happened in the apartment after McCaskill arrived. Later, when Pruett, appellant and McCaskill left he joined them "because I didn't have anything else to do, so I just went along." They went to another apartment, and then "Johnny said he was going to go out to his girl friend's house and he headed south on the freeway—Interstate 35," with Pruett and appellant on the front seat and Stewart and McCaskill in the back. A short time later, Pruett stopped the car, saying something was wrong with it. He told Stewart and McCaskill to get out. In a written pre-trial statement placed in evidence as D–2 without objection, and used by defense counsel for cross-examination, Stewart stated that Pruett remained in the car for a few minutes with appellant and then got out. Pruett next ordered Stewart to get back in the car with appellant, who told him "just to be quiet." As appellant watched in the rear-view mirror, Pruett had McCaskill go behind the car, where Pruett, using a .44 Magnum pistol which Stewart had seen in his hands, shot McCaskill six times. Pruett then ran to the car, entered it, drove a short distance and made a U turn, and as he drove back past the body appellant said: "If he isn't dead, I will call him 'sir.' "

Appellant did not testify, and placed no witness on the stand at the guilt stage.

The evidence reflects that appellant became angry at McCaskill when told by him that he, appellant, was selling "trash—fertilizer" instead of speed, and that appellant told McCaskill, a week before the offense, that "Lenny, something bad is going to happen to you." On the night of the offense, according to witness Stewart, appellant and Joe Pruett came to his apartment together and after staying there several hours one of them left to get McCaskill. Complainant testified that Pruett and appellant came to the Sit N'Bull together, and after a conversation about selling speed, the three went together to Stewart's apartment. McCaskill also testified that he told appellant, after being shown two bottles of "speed" that one of the bottles contained just trash. In riding to the scene of the shooting, appellant and Pruett occupied the front seat of the car. Stewart found that apparently nothing was wrong with the car when it was stopped. According to McCaskill, Pruett ordered everybody in the car to get out; nevertheless appellant remained in it, and Pruett sat with him a few minutes before he got out. He had Stewart get in the front seat with appellant, who cautioned him "just to be quiet." As Pruett was taking McCaskill behind the car to shoot him, appellant watched by looking at the rear-view mirror. After the shooting, as Pruett drove the car past the body lying on the ground, appellant stated of the ex-partner to whom he had stated a week earlier that something bad was going to happen to him, "If he isn't dead, I will call him 'sir.' "

■ While it is true that mere presence at the scene of an offense is not alone sufficient to support a conviction under the principles of V.T.C.A. Penal Code, Sec. 7.02(a)(2), it is a circumstance tending to prove guilt which, considered with other facts in evidence, may suffice to show that the accused was a participant. *Johnson v. State*, Tex.Cr.App., 537 S.W.2d 16. We con-

clude that the evidence in the instant case is sufficient to support the verdict that appellant was a party to the offense criminally responsible for the attempt to murder McCaskill. See V.T.C.A. Penal Code, Sections 7.01 and 7.02(a)(2).

The ground of error is overruled.

The contention is made that the trial court reversibly erred in overruling, without a hearing, appellant's motion for a new trial supported by the affidavit of a juror reflecting jury misconduct at the punishment stage.

The pertinent part of the affidavit of juror Miller attached to the motion for a new trial alleging jury misconduct reads:
" . . . We then deliberated the punishment to be given the Defendant. I was originally for around a ten year or greater sentence. One of the other male jurors, who was a hard-liner for 20 years from the beginning, said, 'If we give him a light ten year sentence, he'll be out in 2 or 3 years.' I then went up to fifteen years, and one of the '20 year-people' talked about parole, and the fact that defendants never serve out their full term. We considered giving the Defendant 10 years and a $10,000 fine (even though I was never in favor of a fine), but after being instructed by the court that the Defendant was responsible for paying the fine, it was decided to give him 20 years instead of 10 years and a $10,000 fine."

In *Heredia v. State*, Tex.Cr.App., 528 S.W.2d 847, this Court, after a thorough discussion of many cases involving the mention in the jury room of parole and length of time a convicted person might have to serve, stated:
" . . . We adhere to those pronouncements in prior decisions that it is common knowledge that from time to time inmates of the Texas Department of Corrections are released on parole. E. g., *Taylor v. State*, Tex.Cr.App., 420 S.W.2d 601. Consequently, the mere mention of this common knowledge would not constitute the receipt of other evidence, nor would a further discussion of it constitute

receiving new evidence any more than discussion of any other matter of common knowledge by the jury. On the other hand, information may be given to the jury, by a juror or someone else, which would constitute receiving other evidence. Information which would constitute other evidence would include, for example, a juror relating his personal knowledge of some particular case from which the jury might then try to 'figure out' what the parole law is. Also, a misstatement of the law by being incorrect, would constitute other evidence, since by being false it certainly could not be classified as 'common knowledge.' See e. g., *Moore v. State*, 171 Tex.Cr.R. 182, 346 S.W.2d 349. The receipt of such other evidence, even if nothing further be shown such as would constitute misconduct requiring a new trial under Section 8, on a proper set of facts could require reversal under Section 7."

While it appears from the affidavit that one of the jurors expressed his opinion as to when appellant might be released, he did not profess to know the law and did not misstate the law. Neither did he relate any personal knowledge of any particular case. The mere mention of the effects of the parole law constitutes jury misconduct, and the court in its charge instructed the jury to that effect. However, the mere mention by a juror of the prospects of the defendant being released before the end of his term, under the circumstances stated in the instant affidavit, does not constitute receipt of additional evidence, and is not such misconduct as to deny a defendant a fair and impartial trial, and does not require a new trial. See *Heredia v. State*, supra; *Austin v. State*, Tex.Cr.App., 531 S.W.2d 615; *Martinez v. State*, Tex.Cr.App., 533 S.W.2d 20.

The record reflects that while the jury was deliberating on punishment it sent a note to the court inquiring who would be responsible for payment of a fine. With the expressed agreement of State and defense counsel, the court responded that a fine, if any, is part of the punishment, and

"is to be paid by the defendant." It was juror Miller's prerogative to decide whether to vote for a lower term of years plus a fine of $10,000 or for a punishment of more years without a fine. Reversible conduct is not reflected. He may not now impeach that verdict by showing the reasons for the conclusion reached. *Martinez v. State*, supra; *Adams v. State*, Tex.Cr.App., 481 S.W.2d 884.

The court did not err in overruling the motion for a new trial without hearing evidence.

■ Appellant next argues that the court erred in granting the State's request for a continuance without requiring it to file a written motion. The record shows that when the case was called for trial March 17, 1975, the district attorney asked for a three weeks' postponement to secure an out of State witness. The court then reset the case for trial on April 14. Appellant requested that the State file a written motion, and the prosecuting attorney agreed to do so. The record contains no such written motion.

■ The granting of a postponement of trial is within the sound discretion of the court. No abuse of such discretion is shown. The contention raised by appellant is overruled.

■ In his fifth ground of error, appellant complains of the court's failure to grant him a speedy trial.

The indictment against appellant was presented December 10, 1974. Legal counsel was appointed by the court January 9, 1975 and the trial was set for January 16. It was subsequently reset for February 4, February 10, February 24, and March 17. Except for the postponement from March 17 to April 14, the date the trial commenced, the record does not reflect the reasons that the case was passed. On March 17, counsel for appellant filed a motion to set aside the indictment for failure to grant a speedy trial. There is no record of this motion having been ruled on by the court. No specific allegations of harm resulting to appellant by reason of a delay in his trial

were alleged. No unavailability of witnesses or loss of testimony due to any delay is suggested. The case went to trial April 14, 1975, and verdict was returned by the jury April 15.

The "balancing test" by which is determined whether defendant's right to a speedy trial has been denied, as set out in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, is thoroughly discussed in *Swisher v. State*, Tex.Cr.App., 544 S.W.2d 379, and *Archie v. State*, Tex.Cr.App., 511 S.W.2d 942. Applying such balancing test, we conclude that appellant was not denied his right to a speedy trial.

The judgment is affirmed.

Opinion approved by the court.

ROBERTS, Judge, concurring.

Although I agree with the result the majority opinion reaches, I feel compelled to comment upon one aspect of the majority opinion.

The majority overrules the appellant's contention that jury misconduct occurred at the punishment stage of the trial. In so doing, the majority concludes that the appellant " . . . may not now impeach that verdict by showing the reasons for the conclusion reached."

Essentially, the majority does not allow the appellant to examine the mental processes of the jurors. The majority, however, fails to recognize that their current position is inconsistent with the majority opinion in *Ex Parte Green*, 548 S.W.2d 914 (Tex.Cr.App.1977). In *Green* the defendant asserted a prior conviction for murder *without malice* as a bar to a subsequent prosecution for a related charge of murder *with malice*. The defendant contended that the jury's verdict at his first trial, where the jury found him guilty as a principal of murder without malice, was an implied acquittal of the charge of murder with malice at the second trial since the murder occurred simultaneously with the murder which formed the basis of the prior conviction.

In *Green* the majority held that the defendant's claim was unfounded, and concluded that the jury at the defendant's first trial did not base its verdict upon a factual determination of the defendant's malice. The majority supported its conclusion with the testimony of a juror from the first trial who testified that " . . . the jury's verdict was not based on a true finding of no malice, but was based upon Petitioner's youth, his cooperation with the police, and his lack of participation in the actual killing . . . ." *Ex Parte Green*, supra at 918.

Thus, this Court *sanctioned* an inquiry into the jury's mental processes in order to support a subsequent conviction. In the present case, the majority *refuses* to allow the appellant to inquire into juror Miller's mental process in a similar effort to sustain a conviction. In *Montemayor v. State*, 543 S.W.2d 93, 99 (Tex.Cr.App.1976) (Dissenting Opinion of Judge Douglas on State's Motion for Rehearing), it was stated that "[a] good rule of evidence works both ways." Regardless of whether the rule is evidentiary or otherwise, this Court should not sanction rules of law which are used to defeat a defendant's contentions in one instance and ignored when they might benefit a defendant in another. Rather, this Court should attempt to be consistent with its previous decisions and not ignore previous inconsistent decisions.

Moreover, adherence to the rule in *Green* —that an explanation of a jury's mental process to explain a verdict is permissible— would not, in my opinion, affect the outcome of the present case.

This conclusion necessarily follows since Miller decided to vote for a twenty-year sentence only after the trial judge's note was given to the jury. Moreover, there is no allegation that any other juror decided to change his vote. *Cf. Martinez v. State*, 533 S.W.2d 20 (Tex.Cr.App.1976). The appellant cannot complain of action to which he acquiesced, particularly when these are not sufficient allegations of jury misconduct.

For the above reasons, I concur only in the result reached by the majority.