**Leon Rutherford KING,
Petitioner-Appellant,**

v.

**James A. LYNAUGH, Director, Texas
Department of Corrections,
Respondent-Appellee.**

**No. 86–2006.**

United States Court of Appeals,
Fifth Circuit.

July 27, 1988.

Ken J. McLean, Houston, Tex., for petitioner-appellant.

Sutherland, Asbill & Brennan, David T. Shelledy, Willard K. Tom, Francis M. Gregory, Jr., Washington, D.C., for amicus curiae—May.

Charles A. Palmer, Austin, Tex., for respondent-appellee.

Marvin L. White, Jr., Asst. Atty. Gen., Jackson, Miss., for amicus curiae—State of Miss.

Before CLARK, Chief Judge, and GEE, RUBIN, REAVLEY, POLITZ, KING, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES and SMITH, Circuit Judges.

EDITH H. JONES, Circuit Judge:

■ The issue before our Court en banc is whether a capital murder defendant is constitutionally entitled to question prospective jurors about their understanding of Texas parole law. We conclude that the Constitution does not require such an inquiry, and accordingly we vacate the prior panel opinion to the contrary and deny petitioner's application for a writ of habeas corpus.[1]

## BACKGROUND

King has twice been tried and sentenced to capital punishment by Texas juries. A brief summary of the grisly crimes that led to imposition of the severest criminal penalty against King is pertinent to our discussion.[2] King and his cohort Allen Ray Carter kidnapped 26–year-old Michael Clayton Underwood and his girlfriend Kay at gunpoint ten years ago as they were leaving a Houston nightclub. The two men decided they ought to "waste" Underwood and threatened Kay with the same fate if she did not stop crying. They drove in King's pickup truck to an isolated vacant lot not far from Houston's Hermann Park. Kay was forced to watch while King beat Underwood's head in with a shotgun butt until it looked like a "broken egg." For nearly five additional hours, King and Carter repeatedly raped and sodomized Kay, continued to threaten her life, and jeered at having made her observe the execution of her "old man." Before they released Kay,

---

1. With one exception, we adopt the panel's analysis of other issues raised by petitioner, none of which are meritorious. *See King v. Lynaugh,* 828 F.2d 257 (5th Cir.1987). That exception is the majority's treatment of the issue whether King was constitutionally entitled to have the jury charged concerning Texas parole law. A panel of our court has previously rejected this position. *See O'Bryan v. Estelle,* 714 F.2d 365, 388–89 (5th Cir.1983), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). As King's counsel conceded at oral argument, this issue is procedurally barred by King's failure to request such a charge at trial. Tex.Code Crim.Pro.Ann. arts. 36.14, 36.15 (Vernon Supp. 1988), 36.19 (Vernon 1981); *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *O'Bryan,* 714 F.2d at 384–85. We disagree with the contention that King's voir dire request, quoted *infra* at 1057, and corresponding objection were sufficient to preserve the issue of the constitutionality of a jury charge on Texas parole law. The purposes of voir dire questions and jury instructions are distinct, as are the constitutional amendments (the sixth or eighth) under which King's argument pertaining to these phases of trial would proceed. This is true despite some overlap between the issues. A trial court could not fairly be held to have addressed or ruled on whether the eighth amendment requires juror consideration of parole as a "mitigating factor" at the defendant's capital punishment hearing, just because it previously rejected his sixth amendment contention that in order to impanel an impartial jury he must be allowed to question them on their knowledge of parole laws. *See King v. State,* 631 S.W.2d 486, 490 n. 8 (Tex.Crim.App.1982) (*en banc*).

2. For additional facts, *see King v. State,* 631 S.W.2d 486 (Tex.Crim.App.1982) (*en banc*). Like the Texas Court of Criminal Appeals, we call the female victim "Kay" as a protective pseudonym.

King removed from her purse a slip of paper containing her address and again threatened to kill her if she called the police. Kay was found, bedraggled and hysterical, slumped behind the wheel of her car at approximately 5:00 a.m. She later testified at King's trials.

King stated to the jury during the punishment phase of his second trial: "You all found me guilty of one of the most brutal murders that have ever been in Houston. If I had found a man guilty of that type of murder I figure he deserves the death penalty and that's what I am asking you is that the jury give me the death penalty. That's what I want."

## PERTINENT PROCEDURAL HISTORY

At the start of voir dire, the state court refused defense counsel's request

"[T]o voir dire each and every prospective juror on the question of being convicted of capital murder and in the event of a life sentence that person has to serve 20 years before becoming eligible for parole in light of the fact that the prospective juror is advised the mandatory sentence for capital murder is life or death."

King founded this request on Tex. Const. art. 1, § 19, and the fourteenth amendment to the federal constitution. At the time of trial, however, Texas law forbade jurors to consider information bearing on parole in any criminal case.[3] The jurors were charged at the punishment phase of the trial as follows:

You are instructed that the punishment for capital murder is by death or confinement in the penitentiary for life ...

You are not to discuss among yourselves how long the accused would be required to serve the sentence that you impose. Such matters come within the exclusive jurisdiction of Board of Pardons and Paroles and the Governor, and are no concern of yours.

King did not request a jury instruction concerning Texas parole law.

## DISCUSSION

King contends that the state court violated his sixth and fourteenth amendment guarantees to a trial by a fair and impartial jury[4] by refusing to allow him to question the jurors—or educate them in voir dire—concerning their knowledge of Texas parole laws. He asserts that if they harbor misconceptions about Texas law, for instance, an erroneous belief that a capital murder defendant may become eligible for parole in seven to ten years, they will be biased toward imposing the death penalty. On the other hand, he suggests, proper knowledge about the 20–year minimum prison term prior to parole eligibility in such cases will tend to reassure them that King does not pose the future dangerousness to society contemplated by Special Issue # 2 of the Texas capital punishment law.[5] If the logic

---

**3.** *See, e.g., Munroe v. State,* 637 S.W.2d 475, 476 (Tex.Crim.App.1982) (en banc) ("Our cases have clearly held that any discussion of the parole law by the jury constitutes jury misconduct. ... The parole law is simply not to be considered by the jury during its deliberations.").

Subsequent to affirmance of King's direct appeal and prior to the issuance of the panel opinion, Texas amended its statutes to require the trial court to submit certain instructions regarding good conduct time and parole eligibility to the jury at the punishment phase of trials for non-capital felonies. *See, e.g.,* Tex.Code Crim.Pro.Ann. art. 37.07, § 4(a) (Vernon Supp. 1986). The Texas Court of Criminal Appeals recently held that such instructions violate the separation of powers doctrine in Tex. Const. Art. II, § 1, and the due process clauses of Tex. Const. Art. I, §§ 13, 19. *Rose v. State,* 752 S.W.2d 529 (Tex.Crim.App.1987).

**4.** The dissent briefly posits as an additional, novel ground for King's position that because this is a capital case, the eighth amendment's prohibition on cruel and unusual punishment somehow expands King's sixth amendment guarantee. If this were the case, much of the Supreme Court's discussion in *Turner v. Murray,* and its reliance upon sixth amendment authorities, would have been unnecessary. 476 U.S. 28, 106 S.Ct. 1683, 1686, 1688 and n. 9, 90 L.Ed.2d 27. We do not view the eighth amendment as expanding the substantive guarantees of other provisions of the Constitution.

**5.** *See* Tex.Code Crim.Pro.Ann. art. 37.071(b)(2) (Vernon Supp.1988). The 20–year minimum prison term has been reduced to 15 years. *Id.* at art. 42.18, § 8(b)(1) (Vernon Supp.1988).

underlying King's position seems technical to the point of absurdity given the gruesome and wanton nature of his crime, its legal support, which requires a significant extension of *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), and preceding case law, is even thinner. For the following reasons, we reject King's novel theory.

The sixth and fourteenth amendments secure the right of an accused in all criminal prosecutions to trial by an impartial jury. *Turner,* 476 U.S. at 36, 106 S.Ct. at 1688 n. 9, 90 L.Ed.2d 27. Trial courts bear the principal responsibility to implement this important guarantee. Voir dire "plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *Rosales-Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981). Voir dire interrogation can detect veniremen who will not be able to follow the court's instructions and evaluate the evidence, and it facilitates the exercise of peremptory strikes. *Id.* Because the adequacy of voir dire turns on the trial judge's evaluation of demeanor evidence and responses to questions, *id.,* the Supreme Court has sharply distinguished between constitutional review of voir dire in matters that would tend to expose significant prejudice and questions that have a more tenuous bearing on jury selection:

> The Constitution does not always entitle a defendant to have questions posed during *voir dire* specifically directed to matters that conceivably might prejudice veniremen against him. *Voir dire* "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." This is so because the "determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge."

*Ristaino v. Ross,* 424 U.S. 589, 594–95, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976) (citations omitted). In *Rosales-Lopez,* the Court further observed: "Because the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his imme-diate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the *voir dire.*" 451 U.S. at 188–89, 101 S.Ct. at 1634.

This rule of deference has been generally and uniformly applied. Beginning with *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Court "held that adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984) (explaining *Irvin* ). In *Irvin,* however, the Court noted that the trial court's findings of juror impartiality will be overturned only for "manifest error." 366 U.S. at 723, 81 S.Ct. at 1643. *Patton,* the most recent pretrial publicity case in the Supreme Court, rejected an appellate decision that jury impartiality is a mixed question of law and fact, rendering inapplicable the presumed correctness of a state court's factual findings under 28 U.S.C. § 2254(d). The Court held that the partiality of jurors "is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Id.* 467 U.S. at 1036, 104 S.Ct. at 2891. *Patton* thus emphasizes the necessity to rely on a trial court's finding of fact concerning impartiality, both as a matter of common sense and as a requirement of 28 U.S.C. § 2254(d).

In *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), the Court held that under all the circumstances, including the defendant's defense that law enforcement officers had framed him in retaliation for his active and well-known participation in civil rights activities, he was constitutionally entitled to question prospective jurors about their racial prejudice. But, as the Court later explained, *Ham* did not constitutionalize racial voir dire interrogation in every case involving a minority defendant. *Ristaino,* 424 U.S. at 596, 96 S.Ct. at 1021; *Rosales-Lopez,* 451

U.S. at 190, 101 S.Ct. at 1635.[6]

Critical to King's contention is *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), in which the Court relied explicitly on *Ham* to hold "that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias. ... [A]s in other cases involving 'special circumstances,' the trial judge retains discretion as to the form and number of questions on the subject[.]" *Id.* at 36–37, 106 S.Ct. at 1688. Lest there be any doubt that *Turner*'s requirement is limited to voir dire concerning racial prejudice in capital cases, Justice White's opinion specifically notes:

> What we held in *Ristaino,* and reaffirm today, is that absent "special circumstances" that create a particularly compelling need to inquire into racial prejudice, the Constitution leaves the conduct of *voir dire* to the sound discretion of state trial judges.

*Id.* 476 U.S. at 38 n. 12, 106 S.Ct. at 1689 n. 12. Even the dissenters in *Turner* interpreted that decision as extending only to the question of possible racial bias among prospective jurors in capital cases. *Id.* at 43–47, 106 S.Ct. at 1692–93 (Justices Marshall and Brennan, concurring in the judgment in part and dissenting in part; Justices Powell and Rehnquist, dissenting).

*Turner* emphasizes its continuity with the Court's prior decisions placing seminal reliance upon the trial court to eliminate biased veniremen from juries. The decision thus may not fairly be read to imply that the threat of capital punishment, standing alone, is sufficient to warrant intrusive judicial review of a state court's jury selection process. King's argument to the contrary must fail.

■ Because King's proposed voir dire inquiry draws no support from Supreme Court caselaw, we must nevertheless determine whether the principles derived from those cases justify constitutionalizing, at a defendant's request, voir dire consideration of parole eligibility. Three broad inquiries are relevant: (1) whether a juror's knowledge or misconception about parole is so influential that it would generally impair his impartiality; (2) whether any such misconception would be curable by instruction of the trial court; and (3) whether, in any event, a juror's misconception about Texas parole law would have harmed King's position in this case.

Racial prejudice and widespread and provocative pretrial publicity have furnished the only grounds accepted to date by the Supreme Court for a constitutional challenge to the trial court's voir dire procedure. The Court has emphasized that "[t]he Constitution does not always entitle a defendant to have questions posed during *voir dire* specifically directed to matters that conceivably might prejudice him." *Ristaino,* 424 U.S. at 594, 96 S.Ct. at 1020. A graphic example of the Court's distinction appears in *Ham,* where a seven-member Court majority rejected the defendant's contention that he was constitutionally entitled to inquire whether jurors were prejudiced toward people with beards. The Court concluded:

> While we cannot say that prejudice against people with beards might not have been harbored by one or more of the potential jurors in this case, this is the beginning and not the end of the inquiry as to whether the Fourteenth Amendment required the trial judge to interrogate the prospective jurors about such possible prejudice. Given the traditionally broad discretion accorded to the

---

6. In *Ristaino* and *Rosales-Lopez,* the Court held that the defendant was not necessarily entitled to make such inquiries. *Rosales-Lopez* made this point clear:

> [T]here is no per se constitutional rule in such circumstances requiring inquiry as to racial prejudice. Only when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of

a defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion.

**Absent such circumstances, the Constitution leaves it to the trial court, and the judicial system within which that court operates, to determine the need for such questions.**
451 U.S. at 190, 101 S.Ct. at 1635 (emphasis added; citation omitted).

trial judge in conducting *voir dire, Aldridge v. United States* [51 S.Ct. 470, 75 L.Ed. 1054 (1931) ], *supra* and our inability to constitutionally distinguish possible prejudice against beards from a host of other possible similar prejudices, we do not believe the petitioner's constitutional rights were violated when the trial judge refused to put this question.

409 U.S. at 527–28, 93 S.Ct. at 851, 35 L.Ed.2d at 51. Ham's trial and conviction occurred circa the late 1960's and early 1970's, at the apogee of student and political activism, when the wearing of a beard might well have been thought to prejudice many prospective jurors. Nevertheless, the Court refused to constitutionalize an inquiry which, in its view, would have suggested no principled limits on intrusive appellate review of voir dire.

We, likewise, are unable to distinguish possible prejudice based on jurors' misconceptions about parole law from "a host of other possible similar prejudices." The views of a lay venireman about parole are no more likely to be both erroneous and prejudicial than are his views on the defendant's right not to take the stand, the law of parties, the reasonable doubt standard, or any other matter of criminal procedure. It is difficult to conceive how we could constitutionalize the inquiry concerning Texas parole while leaving these similar but also potentially influential matters to the broad discretion of the state trial court. In fact, we have previously declined to sanction constitutional challenges to the failure to conduct voir dire on the range of punishment for an offense and the meaning of certain words in the capital murder statute. *See Milton v. Procunier*, 744 F.2d 1091 (5th Cir.1984); *cert. denied*, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); *Moreno v. Estelle*, 717 F.2d 171 (5th Cir. 1983), *cert. denied*, 46 U.S. 975, 104 S.Ct. 2353, 80 L.Ed.2d 826 (1984). Deference to the state courts in those matters counsels deference here as well. Interrogating veniremen about Texas parole law raises, if anything, a more attenuated possibility of prejudice than does a question about jurors' attitudes toward people with beards.

The specific inquiry does not approach a level of constitutional sensitivity.

The potential influence of a juror's misconception about parole eligibility may also be mitigated by other facets of the trial process, such as the breadth of voir dire as a whole and the jury charge. Our court has previously considered, and found wanting, constitutional challenges to voir dire in state criminal trials where the entire voir dire and the court's charge together satisfactorily explained the law and the jury's function. *See Selvage v. Lynaugh*, 842 F.2d 89, 91–93 (5th Cir.1988); *Milton v. Procunier*, 744 F.2d at 1095–97; *Moreno v. Estelle*, 717 F.2d at 178–79. See also *Byrne v. Butler*, 845 F.2d 501, 505–08 (5th Cir. 1988) (rejecting constitutional challenge based on petitioner's alleged inability to question jurors on Louisiana parole law). In this case, a lengthy and painstaking voir dire was conducted, resulting in the questioning of over five dozen prospective jurors. Repeatedly, the court and counsel advised the veniremen that the capital murder statute offered only two sentencing options: death or life imprisonment. The jury was charged at the punishment phase of trial that, according to Texas law, they were not entitled to consider "how long the accused would be required to serve the sentence," and "the punishment for capital murder is by death or confinement in the penitentiary for life." The state aptly characterizes this instruction as stating that "life means life." If the jurors paid attention during voir dire and followed the trial court's charge, as we generally presume they do, any pre-existing misconception about parole law would have been ignored.

We see no merit, and considerable mischief, in constitutionally requiring voir dire on Texas parole law notwithstanding that Texas disallows jury consideration of the possibility of parole in its deliberations. *Rose v. State*, at 532. Texas policy follows that of the large majority of states and avowedly seeks to assist defendants by forbidding a jury to increase their punishment in anticipation of possible parole or

clemency. *Id.* at 536. Contrary to this policy, King would re-inject notions of parole eligibility at the forefront of the judicial proceedings. Moreover, King has not suggested what response might properly be made by the state if, during voir dire, a defense counsel misstated applicable parole law. It is counterintuitive to imply that the average juror would become more favorably disposed to the average criminal defendant by exposure to some or all of the complexities of parole law during voir dire. We are further reluctant to require asymmetrical constitutional requirements for voir dire and the jury deliberations because of the Supreme Court's determination that a jury instruction on a capital defendant's eligibility for parole or commutation of sentence does not raise a constitutional issue. *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).

■ We should finally consider whether, even if King had possessed a constitutional right to question the jury concerning their views of Texas parole law, any error by the trial court actually prejudiced him. We conclude that any such error was rendered harmless by the court's unobjected charge requiring the jury to disregard parole and by King's testimony in the punishment phase of trial. King told the jury that he expected to receive the death penalty, admitted that he deserved it, and requested that it be imposed. Any subliminal effect of a juror's impressions concerning parole must surely be subordinated to the impact of this testimony. Add to this the determinedly sadistic nature of the crime and associated events, and we find it impossible to think that a jury would have somehow believed King less dangerous to society (including that of the prison in which he is incarcerated) in twenty years than he would be if paroled in seven to ten. King's crime, and his revelry in it, leave no room for hypothesizing that a jury, faced with the information about parole for which King contends, would have been more lenient. If anything, given the egregious nature of this case, a suggestion to prospective jurors that King might return to society in twenty years could very easily have predisposed them to impose a death sentence.

The judgment of the district court is AFFIRMED.

ALVIN B. RUBIN, Circuit Judge, with whom WILLIAMS and JOHNSON, Circuit Judges, join dissenting:

That Leon Rutherford King is a savage criminal has been proved beyond reasonable doubt. Yet even he is entitled to due process when society imposes its sentence on him. The jury in a capital case is called upon to make a "highly subjective, 'unique, individualized judgment regarding the punishment that a particular person deserves.'" [1] Whether a criminal, however vicious, "deserves the sentence of death" [2] depends on what alternative punishment is available. As former Chief Justice Warren Burger has noted, "individual culpability is not always measured by the category of the crime committed." [3]

It is a denial of due process for a judge or jury to impose a sentence without knowledge of the range of discretionary sentencing alternatives. [4] A defendant who raises a genuine issue as to a sentencing judge's understanding of sentencing alternatives is entitled to a hearing before a different judge to determine whether the sentencing judge failed to exercise informed discre-

---

1. *Caldwell v. Mississippi,* 472 U.S. 320, 340–41 n. 7, 105 S.Ct. 2633, 2645–46 n. 7, 86 L.Ed.2d 231 (1985) (quoting *Zant v. Stephens,* 462 U.S. 862, 900, 103 S.Ct. 2733, 2755, 77 L.Ed.2d 235 (1983) (Rehnquist, J., concurring)).

2. *Turner v. Murray,* 476 U.S. 28, 33–35, 106 S.Ct. 1683, 1687 (1986).

3. *Furman v. Georgia,* 408 U.S. 238, 402, 92 S.Ct. 2726, 2810, 33 L.Ed.2d 346 (1972) (Burger, C.J., dissenting).

4. *Hicks v. Oklahoma,* 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980); *Dupuy v. Butler,* 837 F.2d 699, 703 (5th Cir.1988); *Anderson v. Jones,* 743 F.2d 306, 308 (5th Cir.1984); *Williams v. Maggio,* 730 F.2d 1048 (5th Cir.

tion.[5] If a judge, tutored in all the nuances of the law, must exercise *informed* discretion in sentencing, it is all the more important for lay jurors, who have convicted a defendant of a capital offense and must then say whether he will die or live, to understand fully the consequences of their decision. I respectfully dissent from the majority's decision that a state may deprive a defendant of the right to challenge jurors who may sentence him to death because they mistakenly believe that a sentence of life imprisonment will result in his early parole and so in a renewal of the danger he poses to the general public.

### I.

As the majority opinion notes, at the time of King's conviction in 1978, state law required him to serve twenty years in prison before becoming eligible for parole if he were sentenced to life imprisonment rather than death. Yet because misconceptions about parole are widespread, it is likely that the jurors in King's case believed he would be paroled in a much shorter time. Three separate studies conducted in Georgia and Mississippi provide some indication of the content and scope of misconceptions about parole. In the first, researchers questioned forty people, drawn from a random sample of the venire in a capital case in Georgia,[6] about their views of the likelihood of parole for a defendant sentenced to life imprisonment for murder.[7] Thirty-five percent of those questioned said they believed such a defendant would be paroled in seven years.[8] The average of all the responses placed the parole-release date at 8.13 years.[9] Moreover, 67.5% of those questioned said they would be more likely to favor a life sentence over a death sentence if they knew the defendant would have to serve at least twenty-five years in prison before becoming eligible for parole.[10]

The results of the second study were similar. Of a random sample of Georgia voters eligible for jury duty, 58.34% said they thought a prisoner serving a life sentence for murder would be paroled in seven, eight, or ten years, with seven being the answer most frequently given.[11] Two-thirds said they would be more likely to impose a life sentence if they knew the defendant would spend at least twenty years in prison, the exact period King would have had to serve, before being considered for parole.[12]

In the third study, a defense lawyer in a Mississippi capital case[13] contacted thirty-one of the veniremembers in connection with a motion for a new trial. Of the thirty-one, twenty (64.52%) said they believed a murderer sentenced to life would be paroled in five to ten years.[14] The same number said they would incline toward a life sentence if they knew the defendant would never be paroled.[15]

These studies reinforce King's assertion that the average juror, who like the rest of us reads dozens of newspaper reports of grisly crimes committed by parolees, believes that most convicted murderers are back on the streets in less than ten years.

---

1984); *Willeford v. Estelle,* 637 F.2d 271 (5th Cir. Unit A 1981).

**5.** *Anderson,* 743 F.2d at 308; *Hickerson v. Maggio,* 691 F.2d 792, 794–95 (5th Cir.1982).

**6.** *Pope v. State,* 256 Ga. 195, 345 S.E.2d 831 (1986).

**7.** Paduano & Stafford Smith, *Deathly Errors: Juror Misperceptions Concerning Parole in the Imposition of the Death Penalty,* 18 Colum.Hum. Rts.L.Rev. 211, 221–23 & nn. 30–34 (1987) (citing F. Codner, The Only Game in Town: Crapping Out in Capital Cases Because of Juror Misconceptions about Parole 45 n. 114 (Jan. 24, 1986) (unpublished study supervised by the Southern Prisoners' Defense Committee)).

**8.** *Id.* at 222 n. 33.

**9.** *Id.*

**10.** *Id.* at 221 n. 31, 223 n. 34.

**11.** *Id.* at 224 n. 35.

**12.** *Id.*

**13.** *Mississippi v. White* (Grenada County Cir.Ct., No. 5061), *aff'd,* 507 So.2d 98 (1987).

**14.** Paduano & Stafford Smith, *supra* note 7, at 224 n. 35.

**15.** *Id.*

Moreover, the studies confirm what is in any event intuitively obvious: a juror who knows that a life sentence will put a criminal in the penitentiary for twenty years or longer is more likely to reject a death sentence in favor of a life sentence than is a juror who fears the criminal's early release. If this is true in Georgia and Mississippi, it is at least as likely to be true in Texas where the capital sentencing statute specifically focusses the jury's attention on the question whether the defendant will "commit criminal acts of violence that would constitute a continuing threat to society." [16] The "society" to which this interrogatory refers may include the prison community, as the majority contends,[17] but the question certainly also raises concern for the protection of the general public.

## II.

Nevertheless, in Texas at the time of King's conviction and continuing to the present, state law forbade jurors to consider the issue of parole,[18] even at the request of a capital defendant.[19] Thus, King's trial court refused his counsel's request "to voir dire each and every prospective juror on the question of being convicted of capital murder and in the event of a life sentence that person has to serve 20 years before becoming eligible for parole[.]" And, at the sentencing phase of the trial, the court gave this standard jury charge:

> You are instructed that the punishment for capital murder is by death or confinement in the penitentiary for life.... You are not to discuss among yourselves how long the accused would be required to

serve the sentence that you impose. Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and the Governor, and are no concern of yours.

A panel of this court has held that the due process clause does not condemn this instruction or entitle a capital defendant to an instruction on his actual eligibility for parole.[20]

I agree with the majority of the en banc court that King has waived any challenge to this instruction: his counsel did not object to the charge or request a pertinent alternative instruction; he did not defend this procedural default under the cause and prejudice test of *Wainwright v. Sykes;* [21] and, finally and conclusively, he conceded at oral argument before the en banc court that he had not preserved and did not seek to press any challenge to the jury instructions.

I disagree with the majority, however, concerning whether the trial court's instruction to the jury to ignore parole law erased the effect of any pre-existing misconceptions. The instruction provides no information about parole eligibility and so leaves pre-existing misconceptions perfectly intact. Even worse, the instruction invites the jurors' attention to the eventuality of the defendant's release by telling them that decisions about parole "come within the exclusive jurisdiction of the Board of Pardons and Paroles and the Governor." To hint at the defendant's parole eligibility and then to instruct the jurors to ignore the issue asks them not to hear the bell that has rung in the courtroom.

---

16. Tex.Code Crim.Pro.Ann. art. 37.071(b)(2) (Vernon Supp.1988). *Compare* Ga.Code Ann. §§ 17–10–30, 17–10–31 (1982); Miss.Code Ann. §§ 99–19–101, 99–19–103 (Supp.1987).

17. *See also Franklin v. Lynaugh,* —— U.S. ——, —— n. 9, 108 S.Ct. 2320, 2330 n. 9, 101 L.Ed.2d 155 (1988).

18. *See, e.g., Moore v. State,* 535 S.W.2d 357, 358–59 (Tex.Crim.App.1976); *Munroe v. State,* 637 S.W.2d 475, 476–78 (Tex.Crim.App.1982) (en banc); *Rose v. State,* 752 S.W.2d 529 (Tex.Crim. App.1987), *modified on reh'g,* No. 193–87 (Tex. Crim.App. June 15, 1988) (en banc).

19. *O'Bryan v. State,* 591 S.W.2d 464, 478 (Tex. Crim.App.1979) (en banc), *cert. denied,* 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 846 (1980).

20. *O'Bryan v. Estelle,* 714 F.2d 365, 388–89 & n. 21 (5th Cir.1983), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984).

21. 433 U.S. 72, 87, 97 S.Ct. 2497, 2507 (1977). *See also Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 2665–66, 91 L.Ed.2d 434 (1986); *Engle v. Isaac,* 456 U.S. 107, 130, 102 S.Ct. 1558, 1573, 71 L.Ed.2d 783 (1982).

The Supreme Court has before recognized the inadequacy of certain kinds of limiting instructions. The admission of a co-defendant's confession implicating the defendant at their joint trial constitutes reversible error even if the court charged the jury to consider the confession only against the co-defendant and not against the defendant.[22] Justice Brennan explained the rationale of this decision: "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." [23] This case presents precisely such a situation—after being alerted to the possibility of parole, the jury could not simply put the issue out of mind, and the consequences of the jurors' often mistaken speculation could not be more literally "vital" to King.

Texas decisions provide ample evidence that Texas juries in fact disregard the instruction to ignore parole. Just a few months ago, the Texas Court of Criminal Appeals observed:

A general adverse reaction to gubernatorial extravagance in exercising powers to pardon and commute is a documented historical fact, and motivated the people

to impose restrictions on its use.... More recently trial records and our own opinions reflect that often jurors cannot resist the temptation to discuss parole laws.[24]

Texas jurors have requested instructions on the operation of parole laws after having been admonished not to consider that subject.[25] In more than a dozen cases, the court has confronted proof that jurors actually discussed parole during their deliberations on sentencing despite admonitory instructions.[26] In many of these cases, the appellant also produced evidence that parole considerations had influenced the severity of the punishment some jurors voted to impose.[27] In some cases, jurors who voted for enhanced punishments on account of parole considerations had underestimated the time a convict would have to serve before becoming eligible.[28]

### III.

As commentators have recently noted, accurate instructions on the defendant's parole eligibility, at the request of the defendant, may be the best corrective measure.[29] This court's decision in *O'Bryan* [30] notwithstanding, the constitutional case for accurate instructions is strong. In *Fur-*

22. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

23. *Id.* at 135, 88 S.Ct. at 1627. *See also* Paduano & Stafford Smith, *supra* note 7, at 250 n. 139.

24. *Rose v. State,* at 536 (Tex.Crim.App.1987) (en banc).

25. *See, e.g.,* Payne v. State, 516 S.W.2d 675, 676 (Tex.Crim.App.1974).

26. *McIntire v. State,* 698 S.W.2d 652, 660 (Tex.Crim.App.1985) (en banc); *Monroe v. State,* 689 S.W.2d 450, 450–52 (Tex.Crim.App.1985) (en banc); *Dugard v. State,* 688 S.W.2d 524, 527 (Tex.Crim.App.1985) (en banc); *Keady v. State,* 687 S.W.2d 757, 758–60 (Tex.Crim.App.1985) (en banc); *Sneed v. State,* 670 S.W.2d 262, 263–67 (Tex.Crim.App.1984) (en banc); *Diaz v. State,* 660 S.W.2d 93, 94–95 (Tex.Crim.App.1983) (en banc); *Munroe v. State,* 637 S.W.2d 475, 476–84 (Tex.Crim.App.1982) (en banc); *Beck v. State,* 573 S.W.2d 786, 788–91 (Tex.Crim.App.1978); *Carrillo v. State,* 566 S.W.2d 902, 915 (Tex.Crim.App.1978); *McIlveen v. State,* 559 S.W.2d 815, 819–21 (Tex.Crim.App.1977); *Ashabranner v.*

*State,* 557 S.W.2d 774, 777 (Tex.Crim.App.1977); *McCartney v. State,* 542 S.W.2d 156, 161–63 (Tex.Crim.App.1976); *Sweed v. State,* 538 S.W. 2d 119, 120–21 (Tex.Crim.App.1976); *Heredia v. State,* 528 S.W.2d 847, 850–53 (Tex.Crim.App. 1975); *Jones v. State,* 462 S.W.2d 578, 579–80 (Tex.Crim.App.1970).

27. *Monroe,* 689 S.W.2d at 451–52; *Keady,* 687 S.W.2d at 758; *Sneed,* 670 S.W.2d at 263–67; *Diaz,* 660 S.W.2d at 94; *Munroe,* 637 S.W.2d at 482–84; *Carrillo,* 566 S.W.2d at 915; *Ashabranner,* 557 S.W.2d at 777; *McCartney,* 542 S.W.2d at 161; *Sweed,* 538 S.W.2d at 120; *Heredia,* 528 S.W.2d at 850–53. *See also Jones,* 462 S.W.2d at 580 (Morrison, J., dissenting).

28. *Keady,* 687 S.W.2d at 758–60; *McCartney,* 542 S.W.2d at 161; *Sweed,* 538 S.W.2d at 120 & n. 4. *See also Monroe,* 689 S.W.2d at 453 & n. 2 (Clinton, J., dissenting).

29. Paduano & Stafford Smith, *supra* note 7, at 252–53 & nn. 145–149.

30. 714 F.2d 365.

*man v. Georgia,* [31] the Supreme Court held that a sentencer could not impose the death penalty under procedures creating a substantial risk of arbitrary and capricious action. In nearly every case of the post-*Furman* era, the Court has emphasized the importance of channeling the sentencer's discretion so as to minimize the "risk that 'the death penalty [may have been] meted out arbitrarily or capriciously' or through 'whim ... or *mistake.*' " [32]

In *Gregg v. Georgia,* [33] the first death-penalty decision after *Furman,* Justice Stewart wrote:

It is certainly not a novel proposition that discretion in the area of sentencing be exercised *in an informed manner....* If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then *accurate sentencing information is an indispensable prerequisite* to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision. [34]

Thus, a death sentence based upon the jury's finding that a murder was "especially heinous, atrocious, or cruel" cannot stand if the trial court failed to guide the jurors in their interpretation of these words. [35] A death sentence must be vacated if the jurors erroneously believed that, in order to give a mitigating factor any weight, they had to agree unanimously on the existence of the factor. [36] A death sentence cannot stand if the jury was misled to believe that it did not bear responsibility for sentencing, [37] or that it had no alternative but to convict the defendant of capital murder although the evidence might have supported a conviction for the lesser included offense of felony-murder. [38] These decisions represent the Supreme Court's "extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of ... mistake." [39] Under these decisions, I believe the Supreme Court would require the State of Texas to dispel by jury instructions those misconceptions about parole law that might cost the defendant his life.

Even as the Supreme Court has narrowed the jury's discretion to impose the death penalty, the Court has widened the jury's discretion *not* to impose the death penalty, chiefly by invalidating the exclusion of relevant mitigating evidence. In *Lockett v. Ohio,* [40] the Court struck down a statute that required imposition of the death penalty unless the sentencer found one of three specific mitigating circumstances. The plurality held:

[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the

---

**31.** 408 U.S. 238, 92 S.Ct. 2726.

**32.** *Caldwell,* 472 U.S. at 343, 105 S.Ct. at 2647 (O'Connor, J., concurring) (emphasis added) (quoting *California v. Ramos,* 463 U.S. 992, 999, 103 S.Ct. 3446, 3452, 77 L.Ed.2d 1171 (1983); *Eddings v. Oklahoma,* 455 U.S. 104, 118, 102 S.Ct. 869, 878, 71 L.Ed.2d 1 (1982) (O'Connor, J., concurring)). *See also Maynard v. Cartwright,* — U.S. —, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372 (1988); *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27 (1986) (plurality opinion); *Beck v. Alabama,* 447 U.S. 625, 637–38, 100 S.Ct. 2382, 2389–90, 65 L.Ed.2d 392 (1980).

**33.** 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

**34.** *Id.* at 189–90, 96 S.Ct. at 2932–33 (joint opinion) (emphasis added).

**35.** *Maynard,* — U.S. —, 108 S.Ct. 1853 *See also Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

**36.** *Mills v. Maryland,* — U.S. —, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

**37.** *Caldwell,* 472 U.S. 320, 105 S.Ct. 2633.

**38.** *Beck,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

**39.** *Eddings,* 455 U.S. at 118, 102 S.Ct. at 878.

**40.** 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

circumstances of the offense that the defendant proffers as a basis for a sentence less than death.[41]

The range of mitigating factors that the defendant may proffer and that the sentencer must be permitted to consider has expanded since *Lockett*. In *Skipper v. South Carolina*,[42] the Court invalidated a death sentence because the trial court had excluded evidence of the defendant's good behavior *while in jail awaiting trial*. The Court conceded that such evidence did not "relate specifically to petitioner's culpability for the crime he committed" but maintained, nonetheless, that the evidence "would be 'mitigating' in the sense that [it] might serve 'as a basis for a sentence less than death.' "[43] In *McCleskey v. Kemp*,[44] the Court reviewed its own death penalty jurisprudence and stated the rule as to the consideration of mitigating evidence:

> States cannot limit the sentencer's consideration of *any relevant circumstance* that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider *any relevant information* offered by the defendant.[45]

The Supreme Court's reasoning in *California v. Ramos*[46] supports the view that instructions on a defendant's ineligibility for early parole are relevant to individualized consideration of the defendant's character at sentencing. Holding permissible California's "Briggs Instruction," informing the jury that the governor had the power to commute life sentences, the Court noted, "[A]s a functional matter the Briggs Instruction focuses the jury's attention on whether this particular defendant is one whose possible return to society is desirable. In this sense, then, the jury's deliberation is individualized. The instruction invited the jury to predict not so much what some future Governor might do, but more what the defendant himself might do if released into society."[47] Similarly, an instruction on parole would promote individualized sentencing by inviting jurors to consider whether the particular defendant before them would be dangerous in twenty years, given what they know of his background, age, and the circumstances of his crime. In a state like Texas that *requires* death-sentencing juries to consider the defendant's future dangerousness, the relevance of his possible release date hardly seems disputable.

I do not propose to strip defendants of the protection they receive by virtue of state laws excluding instructions on parole in states where defendants sentenced to life imprisonment may be paroled in a relatively short time, ten years, for instance. While instructions on the possibility of early parole might or might not be constitutionally permissible under *Ramos*, these instructions certainly would not be required. Instructions on the possibility of early parole, at the request of the prosecution, would be aggravating, and there is no imperative to admit aggravating information. There is, however, an imperative to admit information that the defendant reasonably considers mitigating, including instructions on his ineligibility for early parole.

The Constitution affords options to the defendant not accorded to the prosecution: the defendant may or may not elect to testify; the prosecution may not compel him to do so. Affording the defendant the right to request an instruction on his ineligibility for early parole does not depend on whether the state may obtain an instruction on his eligibility.

---

**41.** *Id.* at 604, 98 S.Ct. at 2964–65 (emphasis in original) (citations omitted).

**42.** 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986).

**43.** *Id.* at 4–6, 106 S.Ct. at 1671 (quoting *Lockett*, 438 U.S. at 604, 98 S.Ct. at 2964).

**44.** —— U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

**45.** *Id.* at ——, 107 S.Ct. at 1774 (emphasis added).

**46.** 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).

**47.** *Id.* at 1005, 103 S.Ct. at 3455–56.

## IV.

The most serious prejudice to King resulted from the refusal of the Texas courts, approved by this court in *O'Bryan,*[48] to instruct the jury on a capital defendant's parole eligibility from a sentence of life imprisonment. As I noted at the outset, however, King waived any challenge to the "ostrich" instruction that was actually delivered. My discussion of the defects in the instruction is not meant to decide the question whether a capital defendant has a right to an accurate charge upon request, but to show why I diverge from the majority, which relies on King's failure to raise the instruction issue to deny the relief King actually sought.

Knowing that the trial court would not tell the jury that a capital defendant sentenced to life imprisonment would be ineligible for parole for twenty years, King sought to question the veniremembers concerning their beliefs about parole law so as intelligently to exercise his peremptory challenges against those who harbored prejudicial misconceptions. My colleagues in the majority "see no merit, and considerable mischief, in constitutionally requiring voir dire on Texas parole law notwithstanding that Texas disallows jury consideration of the possibility of parole in its deliberations." I, on the contrary, see greater mischief in allowing a constitutionally questionable state policy of shunning an accurate charge on parole to block a capital defendant's effort to discover which of the veniremembers may be biased against sentencing him to imprisonment because they misunderstand the law of parole. It is precisely *because* Texas courts refuse to give accurate, corrective instructions that voir dire about potential jurors' understandings of parole law becomes necessary. The failure of King's lawyer to seek a corrective instruction should not bar King from seeking an alternative way of minimizing the effect of juror misconceptions.

Moreover, this court's decision in *O'Bryan* does not directly contradict a holding that the Constitution entitles a capital defendant to conduct voir dire on the issue of parole. The right to voir dire is not a license to inform veniremembers of the substantive law of parole but only a right to discover and excuse those who harbor prejudicial misconceptions.[49] Thus King asked for relief different from that O'Bryan requested. Furthermore, the right to voir dire is grounded in part in the due-process-clause guarantee of a fundamentally fair trial, in part in the Sixth Amendment guarantee of an impartial jury, and, in capital cases, also in the Eighth Amendment's prohibition on cruel and unusual punishment. The *O'Bryan* panel, however, considered only a due process argument. The Supreme Court has recently made clear that, under the Eighth Amendment, death-sentencing juries must exercise more narrowly channeled and more thoroughly informed discretion than due process alone requires.[50] King's reliance on the Eighth Amendment therefore takes this case beyond the scope of *O'Bryan.*

The right to an impartial jury is basic to our system of justice. This right carries with it the concomitant right to take reasonable steps to ensure that a jury is impartial. One measure to attain this end is the peremptory challenge.[51] A party can make peremptory challenges intelligently only after voir dire examination of the members of the venire. Although the proper scope of voir dire is generally left to the sound discretion of the trial court,[52] that discretion is not unfettered. Limits on voir dire that create an unreasonable risk that bias or prejudice may infect the trial process violate the Constitution.[53]

48. 714 F.2d at 388–89.

49. *See infra* note 65 and accompanying text.

50. *Maynard,* —— U.S. at ——, 108 S.Ct. at 1858 (1988).

51. *Pointer v. United States,* 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894).

52. *See Ristaino v. Ross,* 424 U.S. 589, 594–95, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976).

53. *See Turner v. Murray,* 476 U.S. 28, 33–35, 106 S.Ct. 1683, 1687, 90 L.Ed.2d 27 (1986); *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973).

Supreme Court decisions evaluating the voir dire of veniremembers exposed to adverse pretrial publicity [54] support my view that the ambit of the trial court's discretion does not extend to prohibiting a defendant whose life is at stake from inquiring about misconceptions or preconceptions that raise a serious risk that the jury will be prejudiced against him. In *Patton v. Yount,* the Court stressed that trial judges, who observe and participate in voir dire, are best placed to assess a veniremember's impartiality and that a factual finding of impartiality should, therefore, be presumed correct.[55] Nonetheless, the court reaffirmed that, had "the jurors at Yount's trial had such fixed opinions that they could not judge impartially the guilt of the defendant," [56] Yount would have been deprived of a fair trial and stripped of his right to due process.[57] Following the logic of Supreme Court precedent, this court has held that, when the record reveals a significant possibility that pretrial publicity has prejudiced the venire, the district court is obliged to conduct individual voir dire to assure impartiality.[58] If preconceptions based on unreliable pretrial publicity might so bias a jury as to taint the trial, then misconceptions about the possibility of early parole might so affect a jury's assessment of a defendant's future dangerousness as to undermine due process in a capital-sentencing proceeding.

In *Turner v. Murray,* [59] the Supreme Court held that a defendant accused of interracial capital murder had the right to question veniremembers on the issue of racial prejudice. The plurality rested its decision on three "special circumstances" creating "an unacceptable risk of racial prejudice infecting the capital sentencing proceeding": "the fact that the crime charged involved interracial violence, the broad discretion given the jury at the death-penalty hearing, and the special seriousness of the risk of improper sentencing in a capital case." [60] Similarly, in *Ham v. South Carolina,* [61] the Court determined that the black defendant accused of possession of marijuana had a right to question the venire about racial prejudice because of the "special circumstance" that he was well known and apparently not well liked for his civil rights activities.[62]

I do not read these cases, as the majority intimates, "to imply that the threat of capital punishment, standing alone, is sufficient to warrant intrusive judicial review of a state court's jury selection process." On the contrary, I believe that, as in *Turner* and *Ham,* there were special circumstances in this case creating an unacceptable risk that juror bias tainted the sentencing proceeding. First, at the sentencing proceeding, the prosecution produced evidence of King's three prior convictions and the sentences he had received.[63] Because the time he had actually served was shorter than the time he had been sentenced to serve, the jury must have surmised that he had before been paroled. Indeed, in 1971, King was sentenced to eight years in the Texas Department of Corrections on multiple counts of marijuana possession. If he had served his full sentence, he would not have been released until 1979. Yet the capital murder for which the jury in this case convicted him occurred in 1978. Simple arithmetic might have led some jurors to conclude that he was on parole when he raped and murdered his victims. Second, the court's instruction alerted the jurors to

---

54. *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).

55. 467 U.S. at 1036–38, 104 S.Ct. at 2891–92.

56. *Id.* at 1035, 104 S.Ct. at 2891.

57. *See also Irvin,* 366 U.S. at 722, 81 S.Ct. at 1642.

58. *United States v. Hawkins,* 658 F.2d 279, 282–85 (5th Cir.1981).

59. 476 U.S. 28, 106 S.Ct. 1683.

60. *Id.* at 37, 106 S.Ct. at 1688–89.

61. 409 U.S. 524, 93 S.Ct. 848.

62. *Id.* at 525, 93 S.Ct. at 849. *Compare Ristaino,* 424 U.S. 589, 96 S.Ct. 1017.

63. State's Exhibits 127–129.

the possibility of parole from a life sentence before futilely charging them to ignore this possibility. Third, the Texas death-penalty statute requires jurors to say whether they think the defendant will pose a continuing threat to society and so inevitably raises the question whether he will ever again be released into the general population.

Under these circumstances, the risk is unreasonably high that misconceptions about the possibility of King's early release may have inclined the jury to impose the death penalty. And, as in *Turner*,[64] the "special seriousness ... of improper sentencing in a capital case" and "the broad discretion given the jury at the death-penalty hearing" weigh in favor of requiring the voir dire requested.

Both *Turner* and *Ham* counsel, however, that the trial court retains discretion over the form and number of questions, including the decision whether to question the venire individually or collectively.[65] Defense counsel has no right to educate the venire on the law of parole, as King's lawyer hoped to do. It is enough for the trial court to permit voir dire sufficient to allow the defense to discover whether any member of the venire harbors prejudicial misconceptions.

The majority concludes that King was not prejudiced by juror misconceptions about parole law, not only because King's crime was unspeakably vile, but also because King told the jury: "If I had found a man guilty of that type of murder I figure he deserves the death penalty and that's what I am asking you is that the jury give me the death penalty. That's what I want." Whether this was bravado, a taunt, a gesture of defiance, an effort to inflict guilt on the jury for its verdict, or a genuine request that he be put to death is immaterial. Texas does not permit a defendant to condemn himself to death by pleading guilty to a capital offense; only a jury may impose the ultimate sentence.[66] Defendants, even those already under death sentence, are not permitted to commit suicide. I cannot consider that the error in foreclosing voir dire was either cured or made harmless by King's testimony.

V.

It is cruel to submit even a criminal so wanton as King to a lethal injection if the jurors who imposed that fate on him did so because they did not know what "life imprisonment" meant. The majority opinion will subject not only King but defendants tried after King to a state policy requiring them to accept jurors whose ignorance might prompt a challenge. I would vacate King's death sentence and give the state the option of either retrying or resentencing him, as may be appropriate under Texas law.[67]

---

**64.** 476 U.S. at 37, 106 S.Ct. at 1689.

**65.** *Turner*, 476 U.S. at 35–37, 106 S.Ct. at 1688; *Ham*, 409 U.S. at 527, 93 S.Ct. at 850–51.

**66.** Tex.Code Crim.Pro.Ann. art. 37.071 (Vernon Supp.1988).

**67.** *See Brown v. Estelle*, 591 F.2d 1207 (5th Cir. 1979).